**Jacob PAPALIA, Ollie Clayton Steed, Carl Crawford and Alphonso McBride, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 16058.

United States Court of Appeals Fifth Circuit.

April 9, 1957.

Albert J. Datz, M. M. Myerson, Jacksonville, Fla., for appellants.

E. Coleman Madsen, John L. Briggs, Asst. U. S. Attys., Jacksonville, Fla., for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Four out of six defendants appeal from judgments of convictions entered on a jury verdict of guilty for conspiracy, 18 U.S.C.A. § 371, during the year February 1, 1952, to February 1953 to violate Federal Statutes by transportation, possession, purchase, sale and transfer of distilled spirits without affixing revenue stamps to the containers, operations of a retail and wholesale liquor business with willful failure to pay the tax required and removal, deposit and concealment of untaxpaid liquor with intent to defraud

the Government. In two groups[1] now reduced to two persons in each, represented here and below by separate counsel, appellants make common cause that the evidence was legally insufficient to establish, as charged in the indictment, a single conspiracy (rather than three separate disconnected enterprises) and, failing on that score, assert procedural errors requiring a reversal for a new trial.

1. One group comprised: Ollie Clayton Steed, Carl Crawford, Frank (Slim) Henry Hall, Johnnie (Snow) Johnson, Jr. Only Steed and Crawford appeal.

   The other group comprised: Jacob Papalia and Alphonso McBride.

2. While we reject as of any decisive significance the appellants' separation into three parts, we follow, as a convenience in our discussion, the division into Phase I, II and III:

   Phase I: *Acting on information furnished them by Alphonso Jenkins who lived in the upstairs apartment, city police officers raided the downstairs portion of the garage apartment at 1092 Reiman Street, Jacksonville, Florida, on May 31, 1952. Sixty-eight 5-gallon jugs of non-taxpaid moonshine whiskey were seized. Jenkins furnished a list of described automobiles with license numbers which he had observed coming to the downstairs premises during a period of approximately four months preceding the raid. Among the identified automobiles were the following: a 1940 Buick and a 1939 Plymouth, both of which were observed being driven to this place by appellant Carl Crawford and one of which, the Plymouth, was later parked at his home; a 1940 Chevrolet later and frequently seen in the possession of appellant McBride and parked at his home; and a 1939 Mercury later seen several times parked at the home of appellant Ollie Steed and being driven by Johnson to 1541 Dot Street (scene of Phase II).*

   Phase II: This relates to 1541 Dot Street in Jacksonville. Under close surveillance during October and November 1952 by Government agents the house and garage was the scene of extensive whiskey loading and unloading operations on the part of appellant Steed and the two defendants Hall and Johnson. Also seen here at least twice was appellant Crawford, and on three occasions his Dodge made brief stops. On several occasions Steed and Johnson were seen

handling whiskey in and out of the 1939 Mercury observed in Phase I. At one time during this period at another location the Mercury was found to contain thirteen empty 5 gallon jugs which smelled of moonshine whiskey. Hall was present on many occasions loading or unloading and driving a 1950 Ford which was seen parked at Crawford's home while he and Steed were together on the front porch.

   Phase III: This relates to activities near the home of appellant Alphonso McBride at 6588 Richardson Road outside of Jacksonville, the nearby juke joint of Willie Mae Johnson, and north and to the rear of the juke joint, a small shack in which twenty-two 5 gallon jugs of moonshine whiskey were seized by state officers during an independent raid November 26, 1952. Subsequent to the raid Crawford came into the juke joint inquiring for McBride and remarked, "Well, all I can give him is another nine jugs and that's all." Willie Mae Johnson testified that McBride had the key to the shack and had urged her to take the key so that in his absence she could serve " * * * anybody come wanting whiskey * * *." She had also observed McBride loading whiskey into automobiles and had purchased moonshine from Hall after being approached by Ollie Steed (both active in Phase II).

   Prior to the raid, Jesse Barber, an admitted dealer in such merchandise, who had been directed to McBride at this address by Carl Crawford, bought from him twenty-five jugs of moonshine whiskey. Barber waited there with McBride for delivery of the whiskey. When the car containing the liquor arrived, the appellant Papalia was following it in his Mercury which had been seen many times at McBride's place. Part payment was made to Papalia with the balance to be collected later. Approximately two months after the raid Carl Crawford informed Barber that "Jack [Papalia] wanted the rest of the money."

If there must be a common thread, Crawford is without doubt the shuttle, for as the evidence under the specified overt acts moves from time to time and place to place[2] over this eleven-month period, he weaves in and out as one of the principal moving figures.

■ There was direct, positive testimony, if credited, from which the jury could find that each of the defendants committed one or more of the overt acts.

And this and other evidence, direct and circumstantial, was adequate to warrant the inference that all of the participants had entered into this concerted program.

The movement of the identified automobiles, the stealthily concealed activities behind the closed (and crudely sealed) doors of this small garage at Phase I demonstrated that these premises were used as a major supply and storage point from which liquor operations of wholesale proportions were being carried on. By nature the operation envisaged that distribution either to customers or outlets would require the co-operative, coordinated actions of several persons. And this would scarcely go on without some general plan of understanding by the participants, whether spelled out or not.

Phase II only implicates them worse for, more than a mere physical move to a new base (Phase I was raided by state officers May 31, 1952), Steed, Johnson and Hall were seen in repeated activities transferring empty and full jugs in and out of arriving and departing automobiles. Crawford was likewise sufficiently implicated by his definite trip there on two occasions, subsequent occasions when one of his cars made surreptitious trips to the place, his close contacts with the others, identified use by him of several automobiles at Phase I and II, and the presence at his home of these and other cars identified in the enterprise. This vividly pictured the mechanics of the many participants of this illegal enterprise which, by a continual movement to and from supply points, bringing in and taking out limited stocks of moonshine presumably in response to demand, reduced the likelihood of detection by law enforcement agencies.

And there was ample, in Phase III, to link McBride and Papalia to the program. A car identified as McBride's, seen in his use many times, was one of those identified as used in Phase I. McBride's connection with the liquor business was adequately established by proof showing that he had possession through control of a key locking a small shack where a substantial quantity of moonshine was seized by state officers. Barber, the purchaser, was directed by Crawford to McBride at whose place the delivery was made, and for which partial payment was made to Papalia who arrived simultaneously with the load of liquor. And, some time later, it was Crawford who informed Barber, the purchaser, that Papalia was anxious to get the unpaid balance of the purchase price.

In the total case there was certainly a basis for the jury concluding that Crawford's action in twice steering Barber, once to an outsider and once to McBride, to a source of moonshine was the act of one actively engaged in meeting the demands of the trade while keeping operations physically fluid. The jury was not required to conclude that a man was had been so active at Phase I, in frequent association with those acting in Phase II, and closely connected with numerous automobiles serving as indispensable instruments in the distribution program, was innocently passing out gratuitous advertising of the Papalia-McBride facilities. On the contrary, the jury could, as presumably it did, look upon Crawford's and McBride's action as a helpful and productive step in the consummation of the plan.

The evidence neither proved nor disproved, as a matter of law, the existence or nonexistence of a single, common undertaking. Whether it was, as claimed by the Government, one enterprise, each act of which related to and made up the whole or, as claimed by the defense, it was at most a series of isolated acts singly or aggregated in three separate conspiracies of which Crawford (or others) was a common but coincidental participant, was itself a question of fact. This question, submitted under instructions faithfully applying controlling principles [3] and which plainly required a

3. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557; Montford v. United States, 5 Cir., 200 F. 2d 759; Brooks v. United States, 5 Cir., 164 F.2d 142.

finding of a single, continuous conspiracy as a prerequisite to a verdict of guilty, was for the jury. We are bound by it, and the motions for directed verdict of acquittal fail.

The list of cars observed by the witness Jenkins coming to and from the garage in Phase I, authenticated by him as being an accurate copy of his original list and sufficiently established as being unavailable under the best evidence rule,[4] was certainly admissible as a part of the testimony of this witness. The authenticated copy admitted into evidence listed six automobiles by Florida license numbers and was the paper given by the witness to an officer after the garage at Phase I was raided on May 31, 1952. Considering that the trial was held March 20, 1956, nearly four years later, it is understandable that either with or without the list, the witness was unable to "remember," i. e., call out from the storehouse of his memory the sequences of these numbers. He affirmed positively that as the events occurred and he wrote the license numbers down on the original list, they were correctly recorded. This, with the additional evidence that he could no longer refresh his memory by the list (or copy) made the list itself admissible as a record of a past recollection[5] and not, as claimed, an unpermissible effort to bolster up testimony by a prior, consistent statement.[6]

We find no error in any of the objections made to the Court's charge. The first, in usual form that failure to produce a witness creates a presumption that the testimony would have been unfavorable was not necessary. The persons argumentatively mentioned in the brief as being available but uncalled were, if their testimony was of more than cumulative value, equally available[7] to prosecution and defense, and this charge in general terms would have been of no help.

Nor was it erroneous to decline a charge on accomplices for if required,[8] the purchasers Barber and Willie Mae Johnson, though perhaps participants[9] to a substantive offense of illegal sale of untaxed liquor, were in no way connected by evidence with the conspiracy. Ironically, for McBride and Papalia to urge that their purchasers were parties to the conspiracy, i. e., agreement to violate the law, is self-incriminating and self-defeating.

Similarly, while a charge properly framed may at times be essential,[10] it was not error here to have declined a special instruction that if any of the witnesses had exhibited prejudice or bias and satisfied the jury that they had not testified truthfully and were not worthy of belief the jury could disregard it altogether. Urging that Barber had ex-

**4.** United States v. Reyburn, 6 Pet. 352, 31 U.S. 352, 8 L.Ed. 424; Sellmayer Packing Co. v. Commissioner of Internal Revenue, 4 Cir., 146 F.2d 707; Nu Car Carriers v. Traynor, 75 U.S.App.D.C. 174, 125 F.2d 47.

**5.** McCormick, Evidence, § 278 (1954); 3 Wigmore, Evidence, § 754 (3d ed. 1940); 32 C.J.S., Evidence, § 696; 20 Am.Jur., Evidence § 946; see 3 Wharton's Criminal Evidence § 852 (1955).

**6.** Appellants cite: Boykin v. United States, 5 Cir., 11 F.2d 484; Mellon v. United States, 5 Cir., 170 F.2d 583; United States v. Toner, 3 Cir., 173 F.2d 140.

**7.** See Shurman v. United States, 5 Cir., 233 F.2d 272; cf. Ford v. United States, 5 Cir., 210 F.2d 313; Nalls v. United States, 5 Cir., 240 F.2d 707.

**8.** Caminetti v. United States, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442, cf. McLendon v. United States, 8 Cir., 19 F.2d 465; United States v. Bucur, 7 Cir., 194 F.2d 297, 305; Stoneking v. United States, 8 Cir., 232 F.2d 385, 391, certiorari denied 352 U.S. 835, 77 S.Ct. 54, 1 L.Ed.2d 54.

**9.** West v. United States, 5 Cir., 113 F.2d 68, certiorari denied 311 U.S. 647, 61 S.Ct. 33, 85 L.Ed. 413; United States v. De Vasto, 2 Cir., 52 F.2d 26, 78 A.L.R. 336, certiorari denied 284 U.S. 678, 52 S.Ct. 138, 76 L.Ed. 573.

**10.** Coleman v. United States, 5 Cir., 167 F.2d 837, 840, 841; Pinkerton v. United States, 5 Cir., 145 F.2d 252.

pressed the feeling that since his moonshine was hijacked almost immediately after he purchased it from McBride-Papalia and put it in his shed, that they must have done it and that Willie Mae Johnson, as the proprietor of a "confectionary" incidentally dispensing moonshine by the drink, was attempting to divert suspicion of guilt from herself to the defendants, the appellants strain to make this record reflect such a feeling of hostility and ill will by these witnesses as to require a precautionary instruction. Such events might be the seed of a demonstrated hostility requiring special emphasis, but in this record we think the Court's full charge [11] on the duties and responsibility of the jury in passing upon credibility of the witnesses was quite sufficient.

Finally, we come to the contention that the Trial Judge by too great a participation in asking questions, making statements as to what testimony had been and ruling on certain objections displayed, in the jury's mind, apparent bias in favor of the prosecution so that a fair trial could not be had. Stating as we have both so recently and so vividly in imperative terms [12] that a Trial Judge must not only refrain from actions which are prejudicial but as well those which do or might give such impression to a jury of laymen whose awesome respect for the institution of the Judge leads them to accord great and, perhaps, decisive significance to his every word or intimation, we have felt it necessary carefully to review this entire 410-page printed record. So doing leaves us with the clear impression that the Judge was scrupulously impartial, went to great lengths to afford opportunity for the appellants' able and vigorous counsel to record objections to the Court's action in a manner to avoid the disruptive implication that they were challenging the Court and, where matters were thought by Court or either counsel to be susceptible of harmful effect upon the jury, steps were taken to assure opportunity for a full development by hearings in chambers, at the bench, preceding or subsequent to jury sessions, and the like. Despite the full opportunity freely to record objections out of the presence of the jury, not a single word was spoken, not an objection was uttered during the trial, not a reason was set forth in the detailed motion for new trial filed two weeks later while all was fresh in counsel's mind complaining of every other error we have had to consider. It was not until January 25, 1957, nearly a year after the verdict of guilty that, with the filing of appellants' brief, any complaint whatsoever had ever been made of this action by the trial court. We emphasize this not as a technical failure on appellants' part to take procedural steps to preserve the point. Rather we do it as the strongest possible corroboration to our independent reading of this record: excised and truncated, the words and actions of the Court appears at times to raise a question, but read as a whole, these were comments so normal and expected in the running superintendence of a complex trial, that no counsel, seeking diligently all legitimate ways to preserve the defendants' rights

11. See, e. g., "But if you find that you cannot reconcile such conflict, you may believe or disbelieve any witness or witnesses as you may or may not consider them entitled to credit. If you disbelieve any witness or witnesses, you have the right to ignore his or their testimony in making up your verdict, since you should base your verdict only on testimony which you believe to be true. * * * In weighing a witness's testimony, among other things, you should consider the witness's apparent intelligence or lack of intelligence; his relationship, if any, to the parties in the case; his interest, if any, in the result of the case; *his bias or prejudice*, if any, *for* or *against* any of the *parties* in the case; his appearance on the witness stand and his manner of testifying; * * * and all the other evidence in the case tending to corroborate or to contradict his testimony * * *" (emphasis supplied.)

12. Blumberg v. United States, 5 Cir., 222 F.2d 496, 501; Steele v. United States, 5 Cir., 222 F.2d 628; Zebouni v. United States, 5 Cir., 226 F.2d 826.

with the ever present hope of a reversible error as anchor to the windward, ever thought that what was then occurring was unfair or prejudicial.

The case was fairly tried by a jury under proper instructions. That is the end of it.

Affirmed.