**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Louis Johnnie B. REED, Defendant-Appellant.**

**No. 26640.**

United States Court of Appeals
Fifth Circuit.

Aug. 1, 1969.

---

Swep S. Taylor, Jr., Jackson, Miss. (Ct. Apptd.), for appellant.

Robert E. Hauberg, U. S. Atty., Joseph E. Brown, Jr., Asst. U. S. Atty., Jackson, Miss., for appellee.

Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.

COLEMAN, Circuit Judge:

Johnnie B. Reed was tried to a jury on an indictment charging a violation of 18 U.S.C. § 2312, the interstate transportation of a motor vehicle from Hammond, Indiana, to Forest, Mississippi, knowing it to have been stolen. We affirm.

On January 3, 1967, Reed was arrested and charged. The automobile was found at the home of his parents near Forest

and was identified as the same automobile taken from the used-car lot of Pierce Ford, Inc. in Hammond, Indiana, on or before December 6, 1966.

At trial, the defense did not dispute the theft or the transportation. Its defense was that Reed had no knowledge that the vehicle was stolen.

Reed, a native of Mississippi, had moved to Hammond, Indiana, less than a year before the events in question. While there, he became acquainted with Raymond Eugene Williams. On December 6, 1966, Reed met with Williams, who was then in possession of two automobiles, a 1966 yellow Mustang convertible and a 1965 red Mustang. Reed, desiring to get to Mississippi to see his parents for Christmas, was asked by Williams to drive the yellow Mustang down there, while he would follow in the red Mustang. Williams told him that if he were stopped and asked who owned the automobile, to reply that he (Reed) owned it. Before leaving Hammond, Reed and Williams took the license tags from two of Reed's automobiles and attached them to the two Mustangs. They then proceeded to drive to Mississippi in the separate vehicles, arriving there December 8 and returning to Indiana December 16, leaving the yellow Mustang at the home of Reed's parents. While in Mississippi, Reed told several friends that he owned the yellow Mustang. Both Reed and Williams returned to Mississippi December 18 in the red Mustang. Some time after their arrival, the vehicle was wrecked and sold to a junk dealer for $100.

A Mississippi Highway Patrol officer first inquired as to the ownership of the yellow Mustang at Reed's parents' home after it had been determined that the red Mustang had been stolen. Reed told him that he owned the yellow automobile. He was taken to the Forest Courthouse, advised of his rights, and questioned by an F.B.I. agent. At that time, Reed told the agent he had bought the car at a used-car lot in Hammond, that Williams had co-signed the note, and that he had left the bill of sale back in Indiana. But during questioning on January 4, Reed stated that he purchased the automobile at a junk yard.

At still a later interview and in response to a disclosure that it had been determined the car was stolen, Reed stated that he had borrowed it from Williams, used a tag from his own car, and drove it to Mississippi. When Reed was questioned January 11, he told the agents that he learned the yellow Mustang was stolen soon after the red Mustang was wrecked, when he overheard the man who bought it tell Williams to drive the yellow Mustang around awhile to "cool it off".

At the trial, Reed took the stand in his own behalf and admitted that he changed his story as to the ownership of the yellow Mustang during the course of the interviews. He stated that he earlier admitted owning the car because Williams told him to do so. He also stated that he knew the car was stolen even before he was questioned by the officers, but that he did not know if it was stolen when he drove it to Mississippi.

Williams also testified, admitting that he had stolen the yellow Mustang, but contending that Reed knew nothing about the theft or the fact that he planned to sell it in Mississippi. He stated that he had told Reed to admit ownership of the car if questioned about it. When the red Mustang was wrecked, Williams disclosed, he removed the license tag and threw it away because "I didn't want to get Reed in any trouble just in case I got busted, because he didn't know anything about it". On cross-examination, he admitted that when questioned by the F.B.I., he told them that since he had broken probation in Texas and would have to serve time, he was not going to say anything to get Reed in trouble.

On the basis of this evidence, Reed was convicted of transporting the yellow Mustang in interstate commerce, knowing it to be stolen, and was sentenced to five years imprisonment.

Appellant here contends that he is entitled to a reversal because (1) the evidence failed to show guilty knowledge

beyond a reasonable doubt and to the exclusion of every hypothesis consistent with innocence and (2) statements of the trial judge at the time the defendant took the witness stand were so prejudicial that he was deprived of a fair trial.

■■ In a Dyer Act case, the government must prove (1) that the car was stolen, (2) that the defendant transported it in interstate commerce, and (3) with knowledge that the automobile was stolen. Moody v. United States, 5 Cir., 1967, 377 F.2d 175. The duty of the appellate court is to view the evidence in the light most favorable to the government to determine if a jury could reasonably accept the evidence as adequate to support a conclusion of the defendant's guilt beyond a reasonable doubt. Montoya v. United States, 5 Cir., 1968, 402 F.2d 847, 850. In other words, "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it". Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941). Here, the only element in dispute is whether the defendant possessed the requisite knowledge that the vehicle was stolen. Since this knowledge, or lack of it, was based on circumstantial evidence, the inferences reasonably to be drawn from the evidence must be consistent with guilt and inconsistent with every reasonable hypothesis of innocence. Odom v. United States, 5 Cir., 1967, 377 F.2d 853.

■ Little would be accomplished by citing the numerous cases dealing with the question of whether a defendant had knowledge that the vehicle transported in interstate commerce had been stolen, since each turns on its own facts. But it should be noted that this and other Circuits have long recognized that the unexplained possession of a recently stolen automobile warrants the inference that the person in possession had knowledge of the theft of the vehicle. Pilgrim v. United States, 5 Cir., 1959, 266 F.2d 486; Barfield v. United States, 5 Cir.,

1956, 229 F.2d 936; see, also, Williams v. United States, 10 Cir., 1967, 371 F.2d 141. And it is a question for the jury whether the inference of guilty possession is overcome by the defendant's explanation. Beufve v. United States, 5 Cir., 1967, 374 F.2d 123; United States v. Angel, 7 Cir., 1953, 201 F.2d 531. As the Court in Moody v. United States, 5 Cir., 1967, 377 F.2d 175, 177, remarked:

> "[Appellant] seems to contend that her explanation and protestations of innocence coupled with her husband's testimony at trial that she did not have the requisite knowledge had the effect of overriding the effects of possession. However, inconsistent statements made by her and her husband cast doubt upon their explanations and their credibility; and it is particularly within the province of the jury to believe or disbelieve her claims of innocence. There was substantial evidence from which the jury could and obviously did infer that she transported the vehicle with knowledge of its stolen character."

■ Measured by these standards the proof obviously was sufficient to go to the jury and adequately supports the verdict.

As the defendant took the witness stand the following discussion occurred in the presence of the jury:

> "THE COURT: Let me tell you something before you take the witness stand. You know what perjury is?
>
> "THE DEFENDANT: Perjury?
>
> "THE COURT: That's false swearing under oath and I want to caution you about that, that you are sworn here to tell the truth and the whole truth and nothing but the truth, and when you answer material questions here, if you make a false answer, that's perjury, and the penalty for that is at least ten years. * * *
>
> "THE DEFENDANT: Yes, sir.
>
> "THE COURT: In the penitentiary, so don't make the mistake of violating that law now.

"THE DEFENDANT: Yes, Sir.

"THE COURT: All right."

█ Appellant contends that such action on behalf of the Court created an impression on the minds of the jury that the defendant would not tell the truth, thereby prejudicing him and depriving him of a fair and impartial trial. At the time of this colloquy, defense counsel made no objection. Therefore, unless the comments constituted plain error, the alleged error was waived. Rule 52 (a), F.R.Crim.P.

If this were a matter of first impression we would be inclined to agree that this was error and very likely amounted to plain error. We so stated from the Bench during oral argument.

We find the point foreclosed, however, by the decision of this Court in Hellman v. United States, 1964, 339 F.2d 36. In Hellman the defendant was being tried for a wilful failure to file federal income tax returns. During the course of his testimony the following transpired between the witness and the Court:

"THE COURT: Did you pay your income tax for each of those years?

"THE WITNESS: From the New York office, yes.

"THE COURT: You paid by check?

"THE WITNESS: No, I didn't pay it myself.

"THE COURT: You swear your brother paid the income tax returns for those years for you?

"THE WITNESS: Yes, sir.

"THE COURT: And your sister?

"THE WITNESS: Yes, sir.

"THE COURT: Mind you, you are under oath, and you are swearing that you know that they were paid by him.

"THE WITNESS: Yes, and I have proof in writing to show that, too, sir.

"THE COURT: The income tax people have proof whether you paid it or not.

"THE WITNESS: I showed this to them, sir. They saw that. I wasn't trying to hide anything.

"THE COURT: You are sure you are telling the truth?

"THE WITNESS: Yes, sir.

"THE COURT: It is a very serious penalty if you are not."

This Court held that in the context of the trial this interrogation, alluding to the penalties for perjury, and asking the witness-defendant if he was sure he was telling the truth, failed to demonstrate "the clear showing of prejudice which is necessary to establish an abuse of the trial judge's discretion in examining the defendant".

The context, by comparison, was not materially different to that in the case *sub judice*. The reported case speaks for itself and we see no necessity for repeating the details here. Suffice it to say, Hellman was floundering from improbability to improbability, in a rather incoherent, disconnected way. Moreover, he was a heart patient and it was reported that jurors had seen him lying down in a corridor, evidently suffering a paroxysm of some kind.

In our present case the inconsistent statements made by Reed to the F.B.I. agents had already been introduced in the Government's proof. He had not begun any testimony. The Court asked him if he knew the penalty for perjury, told him what it was, and told him not to make the mistake of violating that law.

If Counsel had objected it would at least have given the Court an opportunity to caution the jury that he intended no reflection on testimony not yet heard and was making no comment on its veracity. If, however, an objection had been made, the Court would have been at least technically justified in overruling it on the authority of Hellman, supra. This eliminates any room for *plain* error.

Moreover, in the context of this trial, the record reveals that the jury had already heard the detailed testimony of

the warnings given Reed when the agents took statements from him. If the jurors attributed any significance to what the Judge said, and assuming that they did, it is as likely that they thought the warning was required by law as that testimony was being impugned in advance. From vast publicity, and considerable controversy, the lay juror may be expected to believe that criminal procedure in this day and time is replete with warnings.

■ We, therefore, cannot allow this occurrence to reverse conviction.

We take occasion to emphasize, however, a warning of our own, so many times given, that trial judges should, they must, be careful to refrain from going out of bounds in this critical area of the criminal trial. In this we imply no criticism, for judges not only wish to be fair and impartial, they generally do their best to observe the standard.

Affirmed.

SIMPSON, Circuit Judge (dissenting):

With deference, I cannot concur in the affirmance of this conviction. "Plain error" occurred in Reed's trial which deprived him of his liberty without due process of law in violation of his Fifth Amendment rights.

The sole factual question raised by Reed's defense was his knowledge or lack of knowledge, that he was transporting a stolen automobile. The success of this defense depended almost entirely on the jury's view of his credibility, and to an extent that of his sole witness, Raymond Eugene Williams. Williams testified that he himself stole the car in question in Indiana and that he had it in his possession for several days before he asked Reed to drive it to Forest, Mississippi. Both Reed and Williams testified that Reed did not know of the stolen character of the vehicle prior to arrival in Mississippi with it. Both testified that the Indiana license plates on the car were taken from a 1958 Pontiac owned by Reed, at Williams' insistence.

The record shows that Reed was an illiterate twenty-one year old Negro who had gone to the northern Indiana area, near Chicago, Illinois, to find work a few months prior to the trip home to Mississippi in early December, 1966. He had no prior criminal record. Williams was a considerably older Negro with, according to his own testimony, a long arrest record and four or five prior felony convictions.

The government produced three witnesses. The first was the used car manager of Pierce Ford, Inc., Hammond, Indiana, who testified to the disappearance, without permission from anyone to use it, of the car involved, a 1966 yellow Ford Mustang convertible from the used car lot on December 8, 1966. The next government witness was a Mississippi Highway Patrolman, Rudolph Adcox, who testified to going to the home of the defendant's parents on Highway 21, north of Forest, Mississippi, on January 3, 1967, to investigate a red 1965 Ford Mustang which had been wrecked several days previously in the locality. He related that Reed and Williams drove up in the yellow Mustang and that Reed said the car was his. At Adcox's request Reed and Williams went to the Forest Police Department Office.

The government's third and principal witness was a special agent of the Federal Bureau of Investigation, Mr. Richard L. Brock. He testified to going to the Reed residence on January 3 and hearing Reed state that he owned the 1966 yellow Mustang, and to hearing Williams state that Reed owned it but that he, Williams, had co-signed the note for its purchase. Mr. Brock testified to six separate occasions[1] when he inter-

---

1. January 3, 4, 5, 6, 9 and 11. Reed was read a *Miranda*-type warning card on each occasion and signed the waiver on the face of the warning statement. Reed could sign his name, but was unable to read the warning for himself. At least the last two occasions were after Reed had had a preliminary hearing and had counsel appointed for him by the Commissioner. Brock stated that he offered to secure Reed's attorney's presence on these two occasions but Reed told him that would not be necessary.

viewed Reed in custody. The general purport of Brock's testimony was that Reed at first claimed to have bought the 1966 yellow Mustang, and to have traded in his 1958 Pontiac as a down payment, with Williams serving as his co-signer on the installment contract for the remaining amount due. When Reed was confronted with information Brock had obtained in Indiana that the plates on the Mustang were issued for Reed's 1958 Pontiac, Reed changed his story and claimed that Williams had the 1966 yellow Mustang when he first saw it, and that the Pontiac plates were transferred to it at Williams' insistence before the pair started to Mississippi, with Reed driving the yellow 1966 Mustang and Williams driving the red 1965 Mustang. The latter was the vehicle which was later wrecked, leading to the investigation. The account given by Reed in his later interviews was substantially that which he and Williams related at the trial. Reed said that he told the first story at Williams' suggestion in an effort to protect Williams.

It was against this backdrop that Reed's court-appointed counsel called him to the stand as the first defense witness. As soon as he was sworn the trial judge greeted him with the colloquy shown on page 439 of the majority opinion.[2]

It is my view that from that moment on Reed's trial was no more than a mockery and a farce. His conviction by the jury was a foregone conclusion.

When Williams, defendant's sole witness other than himself, was called to the stand, the record shows that the trial judge addressed him as follows:

*"RAYMOND EUGENE WILLIAMS* called as a witness for and on behalf of Defendant, was sworn and testified as follows:

BY THE COURT:

Let me caution you as I did that other party that this Court doesn't put up with any perjury. We want the truth out of you and nothing but the truth. · That's what you just swore to do and you know the penalty for telling an untruth in this Court?

BY THE WITNESS:

I think so.

BY THE COURT:

What's that?

BY THE WITNESS:

I think so.

BY THE COURT:

You don't care about me telling you what the penalty is?

BY THE WITNESS:

Tell me if you want to.

BY THE MARSHAL:

Keep you voice up.

BY THE COURT:

What was that?

---

2. It should be noted that contrary to the judge's assertion that the penalty for perjury is "at least ten years", Title 18, U.S.C. Section 1621, the general perjury statute, provides penalty of a "fined not more than $2,000, or imprisoned not more than five years, or both".

Reed was sentenced, without the benefit of a pre-sentence investigation or report, as soon as the jury returned its verdict of guilty, to five years confinement, the top limit under the Dyer Act. Title 18, U.S.C., Section 2312. Before imposing sentence the trial judge addressed Reed as follows:

"Pursuant to this verdict of guilty by the jury, the Court adjudges you, Louis Johnnie B. Reed, to be guilty as charged of the offense stated in this indictment.

In most of these car cases I usually have verdicts of guilty, I mean pleas of guilty and I don't get to know the defendants and I usually give them a rather short sentence, but where I come to know a defendant like I know this defendant from the trial of this case and seeing how he tried to lie out of this verdict by his cunning, complete disregard of the instructions of the Court about the effect of perjury in this Court I am going to waive a pre-sentence report and sentence him now. Louis Johnnie B. Reed, do you have any statement you care to make to the Court before sentence is imposed?"

The sentence was under Title 18, U.S.C., Section 4208(a) (2), so that Reed may become eligible for early parole.

BY THE WITNESS:

Tell me if you want to.

BY THE COURT:

Kind of indifferent about it, are you?

BY THE WITNESS:

It don't make any difference.

BY THE COURT:

All right.

DIRECT EXAMINATION * * *."

It should be pointed out that none of the three government witnesses, the used car manager from Indiana, the Mississippi Highway Patrolman, or the F.B.I. special agent, received similar instructions as to the penalty for perjury. If such instructions are to be given by trial judges, they should be dealt out even-handedly to government and defense witnesses alike.

The reported decisions of this and other courts are replete with directions to trial courts against the expression directly or indirectly by words or conduct in the presence of the jury of an opinion which discriminates or points to the guilt of the accused.[3] The jurisprudence emphasizes that the words of the trial judge have great weight with the jury and that there must be absolute impartiality on the part of the judge as to both his conduct and his remarks in the presence of the jury, in appearance as well as in fact.[4]

In Bollenbach v. United States, 1946, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354, the Court quoted with approval the statement from *Starr* (cited in United States v. Link footnote [4]) and noted that " * * * jurors are ever watchful of the words that fall from him (the trial judge). Particularly in a criminal trial, the judge's last word is apt to be the decisive word". The *Bollenbach* court was dealing with a different factual situation from the one presented here. There the jury was deadlocked and the trial judge attempted a clarification of his previous instructions, which proved to be erroneous. Hence the court's expression that "the judge's last word is apt to be the decisive word" was spoken in the sense of time.

In our case the judge's comments to the defendant and his witness concerning perjury were not "the last word" in the sense of time. Indeed, they were first. I am convinced however that as far as the jury was concerned they were "the last word" regarding the all important issue of Reed's credibility. That was destroyed before he was permitted to say a word in his defense.

3.  See Bursten v. United States, 5 Cir. 1968, 395 F.2d 976; Papalia v. United States, 5 Cir. 1957, 243 F.2d 437; Zebouni v. United States, 5 Cir. 1955, 226 F.2d 826; Blumberg v. United States, 5 Cir. 1955, 222 F.2d 496; Frantz v. United States, 6 Cir. 1933, 62 F.2d 737.

4.  See generally 23 C.J.S. Criminal Law § 987, page 996:

    "It is error for the trial judge to express, directly or indirectly, by words or by conduct, in the presence of the jurors, an opinion which discriminates against, or points to, the guilt of accused, or to make a statement or conduct himself in such a manner as tends to discredit or prejudice accused with the jury, even though the judge so acts by reason of unrestrained zeal or through inadvertence and not as a result of intentional unfairness. So, the trial judge should make no comments or remarks reflecting on the merits of the defense, or depriving accused of any rights with respect to particular defenses raised. Generally statements made by the judge in the presence of the jury that would constitute error if contained in the instructions, are error." and the cases cited in support of the text.

    See further United States v. Link, 3 Cir. 1953, 202 F.2d 592:

    "Trial judges must always keep in mind the possible, if not probable, effect of any statement which they make in the course of a trial or in their instructions to the jury. As was said in Starr v. United States, 1894, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841:

    'It is obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.' "

The fact that the court-appointed trial counsel failed to object to the procedure is in my judgment without import. It was clearly "plain error" under Rule 52(b), F.R.Crim.P., and as indicated at the outset of this dissent, in my opinion a violation of fundamental Fifth Amendment. due process.[5] I would reverse the conviction on this basis.[6]

5. I have no quarrel with the holding of Hellman v. United States, 5 Cir. 1964, 339 F.2d 36, 38, cited by the majority as controlling our decision here. I would simply limit *Hellman* to the circumstances present in that trial. The court's warning of perjury:

> "THE COURT: You are sure you are telling the truth?
> THE WITNESS: Yes, sir.
> THE COURT: It is a very serious penalty if you are not."

came in the middle of defendant's testimony, after rather incredible statements on his part as to the preparation of and filing of his income tax returns by his brother as his attorney-in-fact.

Additionally, after noting that the court's "incisive interrogation" of the defendant may well have been overzealous the *Hellman* court observed that in the context of the whole trial it did not demonstrate the clear showing of prejudice necessary to establish an abuse of the trial judge's discretion in examining the defendant. The court noted that he had been recalcitrant and his answers evasive and that the record indicated that the trial judge was generally considerate of the defendant and his counsel, and maintained an attitude of fairness and impartiality.

To me, at least, this presents an entirely different situation from that of these two Negroes. Without laboring the point, it should be noted that the trial judge here by frequent interruptions indicated his doubt of the veracity of Reed and Williams at numerous places in the record. An example is the following colloquy during the government attorney's cross-examination of Reed:

> "BY THE COURT:
> What part of the statement that the F.B.I. Agent said that you made to him was false?
> BY THE WITNESS:
> When uh Williams told me uh tell him that the car belongs to me and he co-signed it.
> BY THE COURT:
> My question was the F.B.I. Agent said and you heard him what he said, I won't repeat it, but he said he interviewed you several different times. Is any part of the statement that the F.B.I. Agent said you made, false?
> BY THE WITNESS:
> Yes, sir. At first.
> BY THE COURT:
> What I mean is is that what you told him? What he said you told him?
> BY THE WITNESS:
> Yes, sir.
> BY THE COURT:
> But now what is it you say is the truth?
> BY THE WITNESS:
> In uh the last time he interviewed me in uh Forest, he told me he wanted the truth and I told him, I say I done got myself in this trouble and I say I'm trying to get myself out. And I told him how I come 'bout getting the car. Told him I borrowed it from Williams and I put my license plates on it.
> BY THE COURT:
> But what you told him previously was all false?
> BY THE WITNESS:
> Yes, sir.
> BY THE COURT:
> Because Williams had told you to tell him a false statement?
> BY THE WITNESS:
> Yes, sir.
> BY THE COURT:
> Didn't you know that it was a felony to answer an F.B.I. Agent falsely?
> BY THE WITNESS:
> No sir, I hadn't ever been in trouble or anything. I didn't know.
> BY THE COURT:
> All right."

In this instance, the trial judge is shown incorrectly instructing the defendant (and the jury as well of course) about a non-existent felony: answering an F.B.I. agent falsely.

6. I am as disinclined as the majority to engage in criticism of this or any other conscientious, hard working trial judge of this circuit. I was a state trial judge for 11 years and a federal district judge for 16 years. *Zebouni, Blumberg* and *Papalia* (supra, footnote [3]) are all cases tried by me in the district court. In the hurly-burly of trial, any judge, no matter how careful, may commit prejudicial error without realizing it. It is certainly not the function of an appellate court to turn every (or any) appeal into a search for error. It is our duty nevertheless to recognize and correct error when it is apparent. I view the situation presented on this appeal as crying out for such correction.