**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Eli JENKINS, Defendant-Appellant.**

**No. 29684.**

United States Court of Appeals,
Fifth Circuit.

April 23, 1971.

Rehearing Denied and Rehearing En Banc Denied June 9, 1971.

---

Mark R. Hawes, Tampa, Fla., C. J. Abernathy, St. Petersburg, Fla., Terry A. Furnell, Clearwater, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Bernard H. Dempsey, Jr., Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before GEWIN, BELL, and ALDISERT *, Circuit Judges.

BELL, Circuit Judge:

This is a Mann Act case. Appellant, a practicing lawyer in St. Petersburg, Florida, was tried before a jury and convicted on a one count indictment charging a violation of 18 U.S.C. § 2422.[1] He was sentenced to four years imprisonment and fined $5,000. The trial consumed approximately six weeks and was a vigorous contest throughout. One indicia of this vigor is seen in the fact that appellant now urges fifty assignments of error. Upon consideration of the record and all assignments of error, and after extended oral argument, we find no error and accordingly affirm the judgment of the district court.

The indictment charged that Jenkins induced Diane Feldman to go from Atlanta, Georgia to St. Petersburg, Florida, via a common carrier in interstate commerce, for the purpose of prostitution and debauchery in violation of the statute. The essence of Jenkins' defense was that his conduct, whatever it may have been, was not the moving force in the inducement of Feldman to travel as charged.

Taking the view of the evidence most favorable to the government as is the rule, Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; Strauss v. United States, 5 Cir., 1963, 311 F.2d 926, 928, the evidence was as follows:

On November 11, 1966 Jenkins accompanied members of the St. Petersburg Quarterback Club to Atlanta, Georgia for a weekend of football games. The members of the club stayed at the Atlanta Baltimore Hotel. Upon arrival Jenkins was assigned to a suite with another member on the fifth floor.

That evening, through the efforts of some of the members and various other persons, several prostitutes came to the hotel and began successfully plying their trade. Diane Feldman, a professional prostitute accompanied three of the members to a room in the hotel. After completing her business in their room she left and went to the elevator. There she met another member of the St. Petersburg group who invited her to a party then in progress in Jenkins' suite.

She was introduced to Jenkins and had sexual intercourse with him and others in the group who were attending the party. During the course of the evening Jenkins told her that he recognized her and recalled that he had seen a warrant for her arrest in St. Petersburg. She was charged in the warrant with grand larceny. He told her that

---

* Of the Third Circuit, sitting by designation.

[1]. 18 U.S.C. § 2422. *Coercion or enticement of female*

Whoever knowingly persuades, induces, entices, or coerces any woman or girl to go from one place to another in interstate or foreign commerce * * * for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose on the part of such person that such woman or girl shall engage in·the practice of prostitution or debauchery, or any other immoral practice, whether with or without her consent, and thereby knowingly causes such woman or girl to go and to be carried or transported as a passenger upon the line or route of any common carrier or carriers in interstate * * * commerce, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

she could get in serious trouble if she did not return and that he could handle her case and get her off. He urged her to return to the Biltmore the following night when he would introduce her to the judge (a committing magistrate), who had signed the warrant, and they could discuss it.

On the following night, Saturday, Feldman returned to Jenkins' hotel suite. She again participated in acts of sexual intercourse with various persons in the room as did several other prostitutes who were there. While there she met Justice of the Peace Dadswell. They discussed her case and he urged her to return to Florida, stating that Jenkins was a fine lawyer and that he could handle things so that she would not have to go to jail.

She talked further with Jenkins about the charges at which time he told her that the offense of grand larceny was a serious one and that she could be extradited and held without bond. He again offered to represent her in the case. The fee was to be that she would have to furnish her services as a prostitute to Jenkins and his law partner one time. He also assured her that she could find plenty of work as a prostitute in St. Petersburg and that he would help her find a job as a go-go dancer. He then stated that he wanted her to ride back to St. Petersburg on the train with him and that he would pay her way. She declined this offer to return on the train.

On Sunday Feldman talked with her husband who was then in Florida. After relating the incident with Jenkins, he told her that she should return if she thought Jenkins could clear up the charges against her. Feldman also called the St. Petersburg Police Department and verified that there was an outstanding grand larceny warrant against her. She then called Jenkins at his hotel to accept his offer, but he had already checked out. Later that night she took a plane to St. Petersburg.

On Monday she contacted Jenkins and went to his office. He arranged for a bondsman, and agreed to represent her for the previously discussed fee.

On November 16, 1966 she appeared in Justice of the Peace Court for a preliminary hearing on the grand larceny charge. She was transported to court in a black cadillac owned by Jenkins from the hotel where she was staying at the direction of Jenkins. Jenkins, his partner Abernathy, Estes the bondsman, and a law clerk were all in the vehicle.

She was represented at the hearing by Jenkins and Abernathy. During the hearing, argument became quite heated. The judge and counsel retired to chambers. Jenkins came out and told Feldman that something was wrong because a different judge from the one he expected was presiding and that she would have to go to bed with the judge and the prosecutor in order to get the charges dismissed. She agreed. The case was dismissed.

That evening or the next, she was taken to the Gulf Winds Motel where she engaged in sexual relations with seven men, according to her testimony, which was corroborated by some of the participants. Included in the group were Jenkins, Abernathy, the state's attorney who had prosecuted her that afternoon, Estes the bondsman, and Manderscheid, the owner of the motel. The trial judge was not involved.

Jenkins continued his association with Feldman during the next several days. He told her that a JayCee convention was in progress in Orlando and that he could arrange for Manderscheid to take her there to carry on her trade. She was not interested.

On November 22, 1966, Feldman appeared before Judge Richard Carr, a Justice of the Peace, on a traffic ticket charge and was again represented by Jenkins and Abernathy. Jenkins again reminded her that she could get into serious trouble. She agreed with Jenkins to have sexual relations with Jenkins, Abernathy, and the judge in return for their services. There is no evidence

that Feldman responded immediately following this court appearance.

Several days later Jenkins arranged for Feldman to contact Jemison, one of his clients or friends. Jemison had customers who were arriving in Florida. For a negotiated price of $100.00, Feldman spent a night with one of these customers at the Happy Dolphin Inn.

During the first week in December, 1966, Jenkins took Feldman to a house which he owned in a residential area of St. Petersburg. She testified that Jenkins wanted her to live in the house with two other prostitutes and three men. The girls would continue with their profession while the men would use the house as a base to burglarize homes in the neighborhood. She further testified that she gave Jenkins a check for $130 to cover the first months rent. The check was on her husband's account and she forged his name to it with Jenkins watching. Feldman never moved into this house.

On December 9, 1966, Feldman made a third court appearance, this time appearing only with Abernathy. That evening, at the instruction of Jenkins, she met Judge Carr at the Office Lounge. They went from there to the Venice Motel where she engaged in sexual relations with Carr. She testified that Jenkins told her to do this.

About a week after the incident with Judge Carr, Feldman tried without success to obtain money from several of the persons involved in this affair. She testified that the reason she needed money was to return to New York so as to give birth to the baby she was expecting. In this connection, she met Jenkins at his office to seek funds to return to New York. He refused and related to her that her husband had complained about the check given for the rent and that he had been obliged to make it good.

She later phoned Carr and Estes and asked them for money. Estes directed her to come to his office where she was met by Abernathy and Jenkins. After refusing her demands for money, she testified that they threatened to harm

her for having "talked". She also testified that Abernathy threatened her by waving a letter opener or a knife in her face and advised her to keep quiet and leave town.

It developed that Feldman had previously related her story to the vice squad of the St. Petersburg police force. The police advised her to leave town. She also tried to sell her story without success to a local newspaper. The newspaper referred her to the county sheriff who listened to her story and then referred her to the FBI. This prosecution followed.

I.

One group of appellant's contentions turns on the notion that judgment for acquittal should have been granted because the evidence allegedly shows that Jenkins was not the moving inducement for Feldman's travel in interstate commerce. This argument is based on what appellant characterizes as a rejection of his illicit offer to return to St. Petersburg on the train with the Quarterback Club. Taken in the light most favorable to the government, Glasser v. United States, supra, the evidence surrounding the offer and the subsequent conduct of the various participants after Feldman returned to St. Petersburg shows that she only temporarily rejected his offer. Feldman reversed her course after talking with her husband but was unable to contact appellant at his hotel prior to his departure.

Appellant maintains that the real inducement was Feldman's husband, her mother, and the advice of a police officer that the warrant was outstanding. This fact question was decided adversely to appellant by the jury and there the matter ends.

Appellant also argues that the inferences to be drawn from the evidence on inducement would not warrant the jury in excluding every reasonable hypothesis save that of guilt, relying on McTyre v. United States, 5 Cir., 1954, 213 F.2d 65. This rule pertains to circumstantial evidence cases and not to those where the

proof is by direct evidence. Vick v. United States, 5 Cir., 1954, 216 F.2d 228; Strauss v. United States, supra.

The interstate transportation here by United Airlines, a common carrier, was not disputed. The fact of prostitution and debauchery in St. Petersburg was clearly established by direct evidence. There was also direct evidence of inducement on the part of Jenkins. This meets the test of Nunnally v. United States, 5 Cir., 1961, 291 F.2d 205, and makes a question for the jury. Assuming arguendo, however, that the proof on inducement was circumstantial, the evidence taken as a whole was sufficient for the jury to reasonably conclude that Jenkins was guilty beyond a reasonable doubt. United States v. Andrews, 5 Cir., 1970, 431 F.2d 952.

■■ Nunnally v. United States, supra, also forecloses the claim that the evidence was insufficient as to prostitution because Feldman and Jenkins had another purpose in mind, i. e., having the warrant dismissed. *Nunnally* teaches that there can be dual purposes under this statute—prostitution need only be one of the principal purposes. *Nunnally* also destroys the argument that Jenkins did not know an interstate carrier would be employed in the trip to St. Petersburg. It is sufficient as here that a common carrier in interstate commerce would likely be and was utilized.

## II.

■ Appellant's next group of contentions has to do with alleged judicial misconduct. These contentions are without merit. The first act complained of concerns the trial court having advised a government witness of the crime of perjury. This occurrence did not rise to the level of the conduct which we faulted in United States v. Reed, 5 Cir., 1969, 414 F.2d 435, reversed en banc,

421 F.2d 190. It was less than the conduct found to be within the bounds of judicial propriety in Hellman v. United States, 5 Cir., 1964, 339 F.2d 36.

The series of complaints regarding the court's treatment of defense counsel both in and out of the presence of the jury fall into the same category. They have been considered by us in the context of a long and sharply contested trial and, on balance, we cannot say that the trial afforded Jenkins from the standpoint of fairness on the part of the court was not in accord with acceptable standards of judicial propriety or due process.

■ The one episode where the court evidenced unusual irritation and impatience regarding counsel's propensity for moving for mistrials took place during the cross-examination of the last witness and was out of the presence of the jury. Moreover, we hold that any possibility of harm from the court's rulings was cured by the court in the charge to the jury.[2]

## III.

■ ■ Appellant makes numerous complaints concerning alleged prosecutorial misconduct during the course of the trial. Some are so attenuated as to require no discussion. Those with a modicum of substantiality will be considered. The first of these concerns a characterization of appellant as a criminal in the government's opening statement to the jury. This characterization was made in the context of what the government expected to prove. No objection was made by appellant and there was no request for corrective action by the trial court. The failure to object is fatal to this assignment of error. See Fogarty v. United States, 5 Cir., 1959, 263 F.2d 201. Cf. Bridges v. United States, 5 Cir., 1967, 376 F.2d 22.

---

2. "It is the duty of the Court to admonish an attorney who, out of zeal for his cause, does something which is not in keeping with the rules of evidence or procedure. You are to draw no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case. Remember at all times that you, as jurors, are at liberty to disregard all comments of the Court in arriving at your own findings as to the facts."

Appellant's reliance on Hall v. United States, 5 Cir., 1969, 419 F.2d 582; and Steele v. United States, 5 Cir., 1955, 222 F.2d 628, is misplaced. Here the sense of the remark made was that the government expected to prove that appellant, a criminal lawyer, had conducted himself so as to become one of those he usually represented. We construe this as nothing more than a statement that the government expected to prove appellant guilty.

Appellant further attacks the conduct of the prosecutor during the course of his examination of several witnesses. The gravamen of this complaint is that the prosecutor suggested things which were not in evidence through the framing of his questions. We have carefully examined each statement complained of and find the complaints to be without merit. While it is true as appellant points out that the prosecutor cannot suggest that there is other evidence not before the jury on which the prosecutor is convinced of the defendant's guilt, McMillian v. United States, 5 Cir., 1966, 363 F.2d 165, we find appellant's contentions in this regard to be without substance.

Appellant urges that the prosecutor committed reversible error in his final argument before the jury in several particulars. No objection was made by defense counsel. Cf. United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. We must therefore determine whether the prosecutor's argument constitutes plain error in any respect. It does appear that the prosecutor interjected his personal views and beliefs into the case from certain of his comments in the argument. Ordinarily, such conduct is proscribed, see Gradsky v. United States, 5 Cir., 1967, 373 F.2d 706, but the question of its being plain error should be considered in the context of the entire arguments. We have examined the entire record of the arguments of both counsel and have concluded that the comments and conduct complained of was, in the main, rebuttal to the closing argument of defense counsel. Without putting our imprimatur on every remark made by the prosecutor, we perceive no plain error which should be noticed in the absence of objection as was the case.

## IV.

Appellant maintains that reversible error was committed when the government was permitted to put two witnesses on the stand when it was known in advance that they would claim the privilege against self-incrimination. In the leading case of Namet v. United States, 1962, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278, the Supreme Court noted that the lower courts had been reversed in two circumstances. One is in the case of a conscious and flagrant effort by the prosecution to build a case based on the unfavorable inferences which inure from a claim of the privilege. The other is where the inference adds critical weight to the government's case in a form not subject to cross-examination. Neither of these circumstances was present here.

Judge Carr elected to use the privilege selectively. He testified to numerous nonprivileged facts which tended to corroborate the government's case. His reasons for claiming the privilege in some instances and in deciding to answer in others are not clear from the record. For instance, he claimed the privilege as to whether he knew the defendant, but answered that he did recall the preliminary hearing on the grand larceny charge at which the defendant represented Feldman. On cross-examination he did not claim the privilege at all and vigorously disclaimed any wrongdoing on his part which might subject him to prosecution in state court. We hold that Judge Carr's testimony falls well within the rule in *Namet*, supra, that the government had the right to get before the jury nonprivileged information possessed by Carr which would corroborate the government's case.

Robert Manderscheid was examined on *voir dire* out of the presence

of the jury at which time he refused to answer any questions except as to his name, address, and occupation. The trial court upheld his claim of the privilege as to all other questions put to him on the theory that he might also be indicted for the crime for which the defendant was then on trial. The prosecutor stated that Manderscheid had agreed to testify before the trial started and that he had relied on this assurance in making certain statements to the jury in his opening argument. He further argued that the jury would expect to hear from Manderscheid because his name had been mentioned by several previous witnesses. The court then ruled that the government could make him claim the privilege in front of the jury one time and this subsequently occurred. This one episode in the course of a very lengthy trial did not prejudice appellant. *Namet*, supra, 373 U.S. at 189, 83 S.Ct. 1151.

Appellant relies on San Fratello v. United States, 5 Cir., 1965, 340 F.2d 560; rehearing denied, 343 F.2d 711. In that case we held that it was reversible error for the government to force the defendant's wife to claim the privilege against self-incrimination solely for the purpose of prejudicing the defendant in the eyes of the jury. We went on to point out, however, that the defendant cannot automatically prevent the government from forcing a reluctant witness to the stand in every instance where it is known in advance that the witness will claim the privilege:

> "Even in the face of this inevitable inference, it may well be proper in some cases to have the proceeding in the presence of the jury where the government is dealing with what has sometimes been called the 'ordinary' witness; that is, with one not so closely connected with the defendant by the facts of the case, the pleadings, or relationship that the inference of the witness' guilt would likely be imputed to the defendant. The circumstances could be such that the jury would naturally expect the witness to

be called. But a defendant's spouse or a co-defendant would not come within that category." 340 F.2d at 565.

Appellant maintains, nevertheless, that these were not ordinary witnesses and that their claim of the privilege unduly reflected on the defendant. We do not agree. Although Manderscheid was present at the parties at the Atlanta Biltmore Hotel, there was no evidence that he participated in any inducement regarding Feldman. Whatever evidence he might have given was directed to appellant's conduct after he arrived back in St. Petersburg. This could only go to corroborate other evidence bearing on appellant's purpose in inducing Feldman to come to Florida. Judge Carr did not become acquainted with Mrs. Feldman until some two weeks after her return to Florida. His testimony was likewise of a corroborative nature, and did not bear directly on the principal issue in the case, i. e., whether or not the defendant did in fact induce Feldman to come to St. Petersburg.

Finally we note in this regard that the court instructed the jurors that they should not speculate on what any of the answers might be and that they should not infer any incrimination from the refusal to answer. In any event and notwithstanding this instruction, we hold that the inferences that might have been drawn in the circumstances were not of such critical weight as to prejudice appellant. We also hold that the record does not support a claim that the prosecution called the two witnesses in a "conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege." *Namet*, supra, 373 U.S. at 186, 83 S.Ct. at 1154.

### V.

Appellant issued subpoenas to six of the federal grand jurors who indicted him. The subpoenas were quashed on motion of the government. The purpose of calling these witnesses was to impeach Feldman by proving prior inconsistent statements. It ap-

peared that Feldman's testimony before the grand jury was not recorded. Cf. United States v. Howard, 5 Cir., 1970, 433 F.2d 1. Equating the effort to call grand jurors in lieu of using a grand jury transcript for the purposes of argument, there was no showing of a particularized need as is required before disclosure of grand jury proceedings may be permitted. Dennis v. United States, 1966, 384 U.S. 855, 868–875, 86 S.Ct. 1840, 16 L.Ed.2d 973; Posey v. United States, 5 Cir., 1969, 416 F.2d 545, 557. Here several statements of Feldman, investigative files, and a state grand jury transcript were made available to the defendant. In addition, without a federal grand jury transcript, and considering that all available transcripts and statements of Feldman had been made available to Jenkins, we are unable to perceive how the prosecution was advantaged over the defense.

### VI.

We find no merit in the claim that the prosecution withheld exculpatory evidence from Jenkins in violation of Brady v. Maryland, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. This contention had to do with psychiatric records relating to Feldman. The court denied these records to the defense until Mrs. Feldman waived her privilege with respect thereto. They were made available during the extensive cross-examination of Feldman and long before the defense experts testified as to Feldman's mental condition and capacity.

We also hold that the court did not err in denying defendant's request that Feldman be given a mental examination. See Rule 28, F.R.Crim.P., and Mims v. United States, 5 Cir., 1967, 375 F.2d 135, 140–1. The expert testimony as to Feldman's mental condition was more than ample.

### VII.

Appellant urges that the court erred in ordering the jury sequestered without him being aware of it. Mrs. Feldman's mother and baby burned to death in a fire in New York during the first weekend of the trial. The trial judge was notified of this by the prosecutor and he ordered the jury sequestered in order to keep this information from the jury. This act on the part of the court was done solely for defendant's protection and there is no evidence that anything irregular occurred. To the contrary, all of the jurors stated on Monday morning in court that they had heard nothing through the news or otherwise about the case. The judge ordered them not to speculate on why they had been locked up. The better practice would have been for the court to have promptly advised defense counsel of the information received from the prosecutor, or for the prosecutor to have promptly advised defense counsel, so that defense counsel might have been consulted with respect to the sequestration. We find, however, that defendant suffered no prejudice from the manner in which that matter was handled nor in the sequestration.

### VIII.

Appellant urges that the following part of the trial court's charge to the jury was erroneous, and that it requires reversal under the plain error rule, F.R.Crim.P. 52(b):

"As a general rule, it is reasonable to infer that a person ordinarily intends all the natural and probable consequences of acts knowingly done or knowingly omitted. *So, unless the evidence in the case leads the jury to a different or contrary conclusion,* the jury may draw the inference and find that the accused intended all the natural and probably (sic) consequences which one, standing in like circumstances, and possessing like knowledge, should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused." (emphasis supplied)

Appellant contends that the italicized portion of the above charge has the effect of shifting the burden of proof to the accused. In Mann v. United States,

5 Cir., 1963, 319 F.2d 404 we reversed where the same charge was given. We pointed out in that case that "(i)f an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption." 319 F. 2d at 409.

However, we subsequently distinguished *Mann* in Helms v. United States, 5 Cir., 1964, 340 F.2d 15. In that case we noted that while the government always bears the burden of proof, in *Mann* the sole defense turned on mental state, i. e., that the defendant did not intend to willfully evade or defeat the income tax imposed. We held that a different result obtains where the contest centers around objective conduct. See also Henderson v. United States, 5 Cir., 1970, 425 F.2d 134 and South v. United States, 5 Cir., 1969, 412 F.2d 697: which adhere to *Mann* but reiterate the *Helms* distinction.

The government urges *Helms* as controlling here but we pretermit that question for the reason that there is another ground for sustaining the charge as given by the trial court. Immediately following that part complained of, the trial judge added this curative provision:

"Unless otherwise instructed, in determining the issue as to intent, the jury is entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence in the case which may aid in determination of state of mind.

"But the jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence."

This added language avoided the vice in the charge in Mann v. United States, supra. There we said "* * * that it is error to give a charge in a criminal case of this nature, the overall effect of which is to place a burden upon the defendant to produce evidence to overcome a presumption of guilt." 319 F.2d at

410. We hold that this specific instruction regarding burden of proof vitiated any harmful effect which the language complained of might have produced. No such curative language was included in the charge in *Mann, Henderson,* or *South,* supra. Cf. Estes v. United States, 5 Cir., 1964, 335 F.2d 609. The charge as given including the added language is taken from Mathes and Devitt, Federal Jury Practice and Instructions, § 10.06 (1968 Supp.).

 This assignment of error is tangentially related to the assignment of error that the charge conference which took place in chambers was not reported. There was no request that it be reported and the statute, 28 U.S.C.A. § 753(b), requires only that proceedings in open court be reported. We hold that the charge conference in chambers was not in open court and thus the claimed error is without merit.

The other objections now asserted relative to the charge and to the failure to charge were either not made or were not recorded and preserved, and are now barred. Rule 30, F.R.Crim. Procedure. There is no plain error in the assertions.

IX.

 We have carefully considered appellant's contentions regarding the failure of the court to give impeachment instructions during the course of the trial where impeachment was allowed in the case of certain witnesses. These contentions are without merit and do not require elaboration.

 We likewise find no merit in appellant's claims that the prosecutor was improperly allowed to refresh the recollection of several witnesses. The use of a prior statement to refresh the recollection of a witness is proper, even where the statement would not be allowed into evidence. Esperti v. United States, 5 Cir., 1969, 406 F.2d 148. The witnesses in question were friends or acquaintances of appellant. They appeared reluctant to testify for the government because of the sensitive nature of the disclosures which they might have

to make. The trial court was in the best position to deal with the problems involved in the framing of questions by counsel and the impeachment problems presented.

By way of summation, every assignment of error has been carefully considered. Those not discussed are deemed to be without merit and to require no discussion. Appellant received his due under our system. He was represented by able and assiduous counsel in a jury trial free of prejudicial error. The facts were sufficient to make a jury issue and his redemption was for the jury. There the matter must and does end.

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEAR-EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.