UNITED STATES of America,
Plaintiff-Appellee,

v.

James Walter DURHAM, a/k/a "Whitey" Durham, James H. Durham,
Defendant-Appellant.

No. 74–1994.

United States Court of Appeals,
Fifth Circuit.

May 14, 1975.
Rehearing Denied June 11, 1975.

James L. Harrison, Jacksonville, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., John J. Daley, Jr., Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before TUTTLE, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge.

The appellant, James Walter Durham, was tried to a jury and convicted on both counts of an indictment charging him with aiding and abetting the interstate transportation of a fraudulently obtained bank draft.[1]

On appeal, he asserts three separate grounds for granting a new trial, that is, the District Court erred:

1. By giving an instruction on intent which, in certain instances, has been specifically condemned by this Court;

2. In failing to give defendant's requested instruction on the extent to which certain fingerprint evidence could be considered by the jury; and

3. In admitting over objection the testimony of a certain government witness on rebuttal.

Finding no reversible merit in any of these contentions we affirm the convictions.

Viewing the evidence in the light most favorable to the verdict, the relevant facts follow:

In late July, 1971, Durham was employed by John H. Wall to work as a weigher at the Big Top Tobacco Warehouse in Jasper, Florida, near the Georgia state line. The agreement with Wall, a partner in the warehouse, was that Durham would come to Jasper from his home in Reidsville, North Carolina, and work throughout the first four weeks in August in return for compensation of $1500–1800. At the time of his employment, the defendant needed money, so Wall advanced $200 before Durham started work.

Durham's duties as a tobacco weigher entailed weighing truckloads of tobacco and filling out farmers' tobacco marketing cards. This was confined primarily to the warehouse area, although on occasion Durham would be required to go to the office to remove marketing cards or to pick up farmers' checks, if requested. He had no authority in his own right to either issue checks or to encode them on Big Top's check writing machine.

---

1. The substantive provisions under which the defendant was charged are as follows:

> 18 U.S.C.A., § 2314 (1970). Transportation of stolen goods, securities, moneys, fraudulent State tax stamps, or articles used in counterfeiting
> Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;
>
>    *    *    *    *    *    *
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
> This section shall not apply to any falsely made, forged, altered, counterfeited or spurious representation of an obligation or other security of the United States, or of an obligation, bond, certificate, security, treasury note, bill, promise to pay or bank note issued by any foreign government or by a bank or corporation of any foreign country.
>
> 18 U.S.C.A., § 2 (1970). Principals
> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

On Monday, August 23, Durham was working late at the warehouse to assist in unloading and weighing several truckloads of tobacco. At about 9:00 that evening he asked the warehouse manager to give him the keys to the storage cabinet in the office so that he could get a check for Mr. Wall. Apparently Wall had never requested that defendant get him a check, but he got the keys. About thirty minutes later the keys were returned to the floor manager. The following morning, while setting up for the day's work, one of the office personnel discovered that the metal box containing the keys to the check writing machine was unlocked.

The next day Timothy Reagan, a friend of Durham's, arrived in Jasper and was seen with the defendant at the defendant's hotel room.

One day later, August 25, in an automobile leased by Durham, Reagan appeared at the Hamilton County Bank and presented two Big Top Warehouse checks for payment. Both checks were dated August 23, had the imprint of the Big Top check writing machine, and were made payable to one James D. Campeau. Both checks were bogus instruments, neither of them authorized by the Big Top Tobacco Warehouse.

Reagan represented to the bank officers that he was Campeau, a tobacco farmer, and that he needed the checks cashed immediately to pay off other tobacco farmers. The bankers were initially concerned by the total amount of the checks—some $42,000—and they asked Reagan for some identification. However, when Reagan produced a driver's license bearing the name James D. Campeau, and it was found that the endorsements on the checks matched the signature on the license, the bank officers' suspicions were allayed, and they agreed to pay the instruments. At that time the bank did not have $42,000 in large denomination bills, as requested by Reagan, so an alternative method of payment was arranged. Reagan was given approximately $10,000 in large denomination bills, and a bank draft was issued payable to James D. Campeau for the remaining $32,000.

On the afternoon of Thursday, August 26, Reagan checked out of his hotel near Jasper and traveled to Valdosta, Georgia, some twenty-five miles away. There he appeared at the Citizens and Southern National Bank and requested payment of the $32,000 draft he had obtained the previous day in Jasper, Florida, completing an interstate transportation of the draft. Since the instrument was not drawn on the Citizens and Southern National Bank, and since James D. Campeau was not a Citizen and Southern customer, the bank officers in Valdosta refused payment.

Reagan then returned to Jasper and presented the draft to the Hamilton County Bank. Though the officers at the Hamilton County Bank were somewhat reluctant to honor the draft at that time, they realized that the end of the tobacco season was drawing nigh and that it was necessary that the various farmers be paid. Therefore, they ordered payment of the draft. Reagan was given approximately $32,000 in large denomination bills.

Later that same afternoon, two different times, the defendant was seen in Valdosta, Georgia, with a man resembling Reagan. In addition, when Durham picked up his car at a Valdosta repair shop, the attendant noted that he paid the $200 charge out of a large roll of money taken from his pocket.

That same night Durham and Reagan were seen together at the home of a girl in Jasper whom Durham was dating. In a conversation with this woman, the defendant said that he had been in Valdosta that day with Reagan. Durham and Reagan left the girl's home about 4:00 A.M. The defendant then checked out of his hotel room and proceeded with Reagan to Albany, Georgia, to catch a chartered flight to Atlanta. The trip to Albany was made by way of a leased automobile, the defendant having left his own car in Jasper. In addition, the defendant left Jasper without receiving the

remainder of his salary owed by the Big Top Warehouse.

On Friday morning, August 27, Durham, Reagan, and an unidentified man were seen at the Albany, Georgia, airport. There they hired a private plane and were flown to Atlanta. An employee of the aviation company testified that Reagan paid the $96 charge for chartering the plane with a $100 bill, which he pulled from a large roll of money carried in his pocket.

Meanwhile, back in Jasper, on the morning of Friday, August 27, the disbursing clerk for the Big Top Tobacco Warehouse went to the Hamilton County Bank to pick up the weekly bank statement. Upon examining the cancelled checks, she immediately discovered the two checks ostensibly made payable to James D. Campeau. She brought the matter to the attention of the warehouse office manager, who notified the bank to stop payment on the checks in the series from which the two unauthorized checks had been drawn. The Campeau checks were then turned over to David Jones, a partner in the warehouse, who took them to the bank. These checks had been paid the previous day, so any effort to stop payment on them was futile.

On August 30, 1971, the defendant, now back in North Carolina, paid off in cash approximately $650 in indebtedness owed to a North Carolina bank, this despite the fact that Durham had to borrow money to commence work in Jasper and had left Jasper without being paid.

A federal indictment was returned by a grand jury in Jacksonville, Florida, on September 8, 1972, charging the defendant with aiding and abetting the interstate transportation of a fraudulently obtained bank draft and conspiracy to transport in interstate commerce a fraudulently obtained bank draft. The conspiracy count was subsequently dismissed from the case. Subsequent to the indictment, the defendant on two occasions approached two employees of the Big Top Tobacco Warehouse and offered them money to alter their testimony in connection with his trial.

■ With all reasonable inferences which could be drawn therefrom, the foregoing proof is clearly sufficient to support a belief beyond a reasonable doubt that Durham purloined the tobacco warehouse blank checks, that he surreptitiously used Big Top's check writing machine to give those checks the necessary appearance of authenticity, that he immediately passed the bogus checks to Reagan, that he shared in the proceeds of the criminal transaction, and that, indeed, he had to be the very one who had initiated the fraudulent activity.

It is true that Durham was not seen with Reagan when the latter visited the Valdosta bank in an effort to cash the draft and he may not have been the one who physically transported the drafts the short distance back and forth across the Georgia-Florida state line, but he was not indicted for the transportation. He was indicted for aiding and abetting such transportation.

His visits to Valdosta, his presence there with Reagan, his statement that he had been there on the day prior to his precipitate departure, his abandonment of his own automobile and use of a rented vehicle which might hinder immediate apprehension, his abandonment of his employment without so much as picking up the wages due, the possession of large rolls of bills which could not have been obtained in the course of his employment, and his ultimate get away by hired aircraft were highly inculpatory activities. To this it must be added that Durham, not Reagan, rented the automobile which Reagan used to make his unsuccessful trip to Valdosta.

But for one thing, the convictions would be due a quick affirmance.

The District Court gave a jury charge on intent which, in cases to be discussed hereinafter, has repeatedly met with the disapproval of this Court and which has necessitated several reversals, depending on the nature of the individual case. In the face of our repeated efforts to extinguish this instruction we find its continued use hard to comprehend, but our

function here is to determine whether it invalidated this particular conviction. The task is not rendered any the easier by the fact that on a prior trial in which the objectionable instruction was not used the jury was unable to agree on a verdict.

### The Instruction on Intent

The instructional stage now up for review was set as follows:

At the conference prior to the instructions being given the government requested the following instruction upon intent:

"Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made and done or omitted by the defendant, and all other facts and circumstances in evidence which indicate his state of mind. It is ordinarily reasonable to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted."

The request was denied by the Court.

At the same conference the defense offered the following instruction, also denied:

"Intent is operation of mind; the subjective fact is seldom susceptible of direct proof and may be established by consideration of objective facts from which a conclusion may be drawn.

"Intent is a necessary part of the offense here charged and must be proven beyond any reasonable doubt. It may not be assumed nor may evidence be accepted sufficient to prove its existence which does not point to that conclusion and no other."

In lieu of the requested instructions, the Court instructed the jury as follows:

"Intent being an essential element in the perpetration of the offense charged, it must be determined by you. It may be deduced from the facts and circumstances shown in the evidence from which it may reasonably and satisfactorily be inferred. This includes the evidence which shows all of the acts done or statements made by the defendant and the acts and declarations in the presence of those, if any, concerned with him in carrying out the transaction. In other words, the intent is to be gathered by the Jury by those sources by applying their reason and judgment to the evidence and making deductions therefrom which men and women of ordinary experience and observation in the affairs of life would ordinarily draw. When the intent is thus made manifest and the Jury is able to so find beyond a reasonable doubt that satisfies the law and is sufficient if the other elements were shown to sustain guilt. And intent, of course, may not ordinarily be proved directly, because there is no way of fathoming or scrutinizing the human mind. But you may, as I say, infer the defendant's intent by considering the surrounding circumstances. Indeed it is rarely possible, if at all, ever to indicate intent other than by circumstantial evidence, for while a witness may see or hear, and so be able to give direct testimony of what the defendant does or fails to do, of course, there can be no eye witness account as to the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate his intent or lack of intent to commit a crime.

"As a general rule, it is reasonable to infer that a person ordinarily intends all of the natural and probable consequences of acts knowingly done and knowingly omitted. So, unless the evidence in this case leaves you, as the Jury, to draw a different or contrary conclusion, you may draw the inference and find that the accused intended all of those natural and probable consequences which one, standing in like or similar circumstances and possessing like knowledge, would reasonably have expected to result from any act knowingly done or omitted."

There was timely objection, and overruled.

It is at once apparent that, at the end, the instruction contained the following language, disapproved in Mann v. United States, 5 Cir., 1963, 319 F.2d 404,[2] because it has the effect of improperly shifting the burden of proof to the defendant:

> "So, unless evidence in the case leads the jury to a different or contrary conclusion, the jury may draw the inference, and find, that the accused intended all of the natural and probable consequences which one, standing in like circumstances, and possessing like knowledge, should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused."

During the course of the charge the jury was also instructed:

> "Fourth, the defendant in a criminal action is presumed to be innocent until the contrary is proved. And in case of a reasonable doubt as to whether his guilt is satisfactorily shown he is entitled to acquittal. This simply means that the burden of proving the guilt of the defendant rests upon the prosecution, that is, the government of the United States in this case, and that burden includes the proof of every element of the offense necessary to be proved. And that burden, as I said, rests upon the government and never shifts to the defendant."

> \* \* \* \* \* \*

> "If the accused be proven guilty beyond a reasonable doubt,—say so. If not so proven—say so. Keep constantly in mind that it would be a violation of your sworn duty to base a verdict of guilt upon anything other than the evidence in this case, and remember as well, that the law never imposes upon

a defendant in a criminal case the burden or duty of calling any witness or producing any evidence."

### The Prior Cases

Despite the emphatic disapproval appearing in several cases, from the discussion to follow it will be seen that up to the present time the use of the *Mann* instruction has not been held to dictate "automatic" reversal.

*Mann* was an income tax evasion case in which the sole defense was lack of intent and wilfulness. We held that the charge quoted in our Footnote 2 was plain error, despite the fact that appropriate instructions had been given on the necessity of intent and burden of proof. It was said, as generally held, that a correct instruction does not cure the error in giving another inconsistent one. The opinion of the Court declared:

> "If the charge had ended when the jury was told that a person is presumed to intend the natural consequences of his own acts, when considered in the light of the charge as a whole, there would have been no error. When the words, 'So unless the contrary appears from the evidence' were introduced, the burden of proof was thereupon shifted from the prosecution to the defendant to prove lack of intent. If an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption. Such a burden is especially harmful when a person is required to overcome a presumption as to anything subjective, such as intent or wilfulness, and a barrier almost impossible to hurdle results." 319 F.2d at 409.

*Mann* was soon followed by Helms v. United States, 5 Cir., 1964, 340 F.2d 15,

---

**2.** The exact instruction given in *Mann* was as follows:

> "It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference

that the accused intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused." Mann v. United States, 319 F.2d at 408, n. 3.

cert. denied 382 U.S. 814, 86 S.Ct. 33, 15 L.Ed.2d 62. This was another income tax case, charging wilful understatement of income. The *Mann* charge had been given but there had been no objection. The proof on behalf of the prosecution showed that the defendant had kept, or caused to be kept, two sets of records involving the use of falsified tickets. We denied plain error on the ground that the defendant's alleged *objective conduct* was the crucial issue, not his wilfulness or criminal intent.

In our present appeal, however, objection was duly made and overruled.

Then came Henderson v. United States, 5 Cir., 1970, 425 F.2d 134. This was a case of mail fraud, wire fraud, and conspiracy. The *Mann* instruction was given and we reversed. We there said that "In *Helms*, if the objective conduct were proven, 'there [could not] be much doubt about * * * willfulness or criminal intent'", pointing out that in the case then under consideration the defense was that the defendants had not made statements *known to be false or with intent to defraud* (emphasis in the original).

The *Mann* instruction held on to at least a portion of its nine lives and we next met it in United States v. Jenkins, 5 Cir., 1971, 442 F.2d 429. Interestingly enough, this was a Mann Act prosecution, in which the *Mann* charge was given. For its illuminating value as to what *Helms, supra*, meant, we quote, 442 F.2d 437, 438,

> "In Mann v. United States, 5 Cir., 1963, 319 F.2d 404 we reversed where the same charge was given. We pointed out in that case that '(i)f an inference from a fact or set of facts must be overcome with opposing evidence, then the inference becomes a presumption and places a burden on the accused to overcome that presumption.' 319 F.2d at 409.
>
> However, we subsequently distinguished *Mann* in Helms v. United States, 5 Cir., 1964, 340 F.2d 15. In that case we noted that while the

government always bears the burden of proof, in *Mann* the sole defense turned on mental state, i. e., that the defendant did not intend to willfully evade or defeat the income tax imposed. We held that a different result obtains where the contest centers around objective conduct. See also Henderson v. United States, 5 Cir., 1970, 425 F.2d 134 and South v. United States, 5 Cir., 1969, 412 F.2d 697: which adhere to *Mann* but reiterate the *Helms* distinction.

The government urges *Helms* as controlling here but we pretermit that question for the reason that there is another ground for sustaining the charge as given by the trial court. Immediately following that part complained of, the trial judge added this curative provision:

> 'Unless otherwise instructed, in determining the issue as to intent, the jury is entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence in the case which may aid in determination of state of mind.
>
> 'But the jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witness or producing any evidence.'
>
> This added language avoided the vice in the charge in Mann v. United States, supra."

To that point, then, it seems quite clear that *Mann* remained the law but neither had the *Helms* objective conduct exception been repudiated.

We journey next to United States v. Driscoll, 5 Cir., 1972, 454 F.2d 792. Driscoll was convicted of "causing the interstate transport of falsely made or forged traveler's checks with the knowledge that the checks were falsely made or forged, and that with unlawful or fraudulent intent." Driscoll got the *Mann* treatment and the conviction was reversed because the instruction shifted to the defendant the burden of proof on

fraudulent intent. *Helms* was noted but not discussed.

Finally, we arrive at the door of United States v. Wilkinson, 5 Cir., 1972, 460 F.2d 725, another mail fraud case.

In a thoroughly incisive opinion, as the organ of the Court, Judge Clark wrote, 460 F.2d at 733,

> Third, any decision as to whether asserted "burden-shifting" language is so prejudicial as to necessitate reversal must to some extent turn upon the type of case and nature of the evidence which has been presented to the jury. In Helms v. United States, 340 F.2d 15 (5th Cir. 1964), we distinguished the *Mann* case on the ground that *Mann* involved a situation where the entire case turned upon the defendant's mental state, i. e., whether he had deliberately and wilfully evaded certain income taxes, whereas in *Helms* "the contest center(ed) about objective conduct, . . . If the defendant actually instructed Borel to prepare the two sets of records and used the false tickets in making his income tax returns, there cannot be much doubt about his wilfulness or criminal intent." *Id.* at 18–19. We decline now, as we did in *Jenkins,* to place this case squarely in either a *Mann*-subjective or *Helms*-objective category. However, we do note that here the jurors were not reduced solely to presuming intent as they were in *Mann* and *Driscoll, supra* n. 4. Here, if they chose to accept it, they were presented with undisputed evidence that Wilkinson made admissions indicating he knew certain invoices were fraudulent, allowed the practice to continue, and that he was even able to estimate the amount which Phillips had been erroneously charged. Thus, the government's case did not rest upon mere implications of evil motive, but was supported by affirmative objective evidence of that particular element of the alleged crime. To paraphrase *Mann*, in a criminal case of this nature, the overall effect of the charge did not place a burden upon the defendant to produce evidence to overcome a presumption of guilt.

■ From the foregoing examination of relevant cases we can only conclude that the *Helms* exception yet pertains in proper cases.

The question is whether the exception applies to this appeal. We think that it does.

■ The purloining of the warehouse's blank check forms, the fraudulent use of the check writing machine, and the actual forgery of the checks for large sums of money were, as in *Helms,* physical acts. Those acts could have been inspired by only one intent, which was that however, wherever, and whenever it could be brought off those bogus checks would be passed. The proceeds would fraudulently be obtained. Moreover, the jury could reasonably infer that this was the sole purpose for giving the checks to visitor Reagan, to say nothing of furnishing Reagan with a rented automobile which hardly would have been needed for the purpose of getting around the town of Jasper. The light to be derived from Durham's subsequent conduct has already been described. It inescapably follows from all this that the real issue in this case was what, if anything, Durham had *done*; intent could not have been the crucial issue in the case. Considering the nature of the case, the giving of the *Mann* instruction does not warrant reversal.

While somewhat remotely placed in relation to the appearance of the *Mann* charge, it is nevertheless true that the jury was told that the defendant was entitled to the presumption of innocence, that the government had the burden of proving the guilt of the defendant beyond a reasonable doubt, and that that burden never shifted to the defendant. It is true that in United States v. Jenkins, *supra,* the Court emphasized the proximity of such instructions to the objectionable ones but the emphasis there does not remotely hint that we must totally discount their presence in this case.

■ Although we are convinced that the *Mann* instruction does not here require reversal we consider it highly in order to direct attention to a form for instructions on intent expressly approved in United States v. Wilkinson, *supra*, 460 F.2d 725:

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of his knowing acts. The jury may draw the inference that the accused intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any intentional act or conscious omission. Any such inference drawn is entitled to be considered by the jury in determining whether or not the government has proved beyond a reasonable doubt that the defendant possessed the required criminal intent."

### Remaining Points

The government offered proof that Durham's latent fingerprints were found on the back of one of the stolen Big Top Warehouse checks. Of course, the experts were unable to say precisely when those fingerprints came to be placed on the check. Consequently, says the defendant, under the teachings of Borum v. United States, 1967, 127 U.S.App.D.C. 48, 380 F.2d 595, and similar authority, the District Court should have instructed the jury that it could consider the fingerprint evidence only if the circumstances were such that they could have only been impressed at the time of the perpetration of the alleged crime. Otherwise, that they would have no probative value whatever.

■ This reliance on *Borum* is misplaced for the reason that in that case the fingerprint evidence was the only evidence presented by the government tending to link Borum with the crime. There was no evidence tending to prove that he could not have had access to the articles at some time prior to the offense. In this present appeal, there was, as already set forth, a wealth of evidence indicating that Durham was the individual who not only purloined the checks but also fraudulently used the company's check writing machine in the perpetration of the offense. We find no merit whatever in this contention.

■ It is next said that the District Judge abused his discretion when he permitted the jury to hear the testimony of an F.B.I. handwriting expert in rebuttal to, and by way of impeachment of, the testimony of Durham's expert to the effect that the defendant's handwriting appeared on neither of the bogus checks. Viewed as impeaching testimony and not as direct evidence in support of the government's case in chief, it was well within the discretion of the trial judge to have allowed the submission of this testimony to the jury.

The judgment of conviction on both counts is

Affirmed.