**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Bobby Joe DUKE, Defendant-Appellant.**

No. 75–1729.

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1976.
Rehearing Denied March 25, 1976.

J. Hue Henry, Athens, Ga. (Court-appointed), for defendant-appellant.

John W. Stokes, U. S. Atty., Gale McKenzie, James E. Fagan, Jr., Asst. U. S. Attys., Atlanta, Ga., for plaintiff-appellee.

Before THORNBERRY, SIMPSON and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

On February 12, 1975, defendant Bobby Joe Duke was convicted by a jury on a criminal information charging possession of marijuana in violation of 21 U.S.C. § 844. Defendant appeals from that conviction, enumerating as error: (1) the refusal of the trial court to dismiss for prosecution's unnecessary delay in seeking an indictment; (2) an improper instruction to the jury, shifting the burden of proof to the defendant; and (3) the trial judge's elicitation of a verdict of guilty from a reluctant juror.

Pertinent facts in this case are as follows. On March 4, 1974, defendant Duke, a prisoner at the Atlanta Federal Penitentiary, was seated at a table in the visiting room with his wife. At that time, Odell Rich, a guard whose job was to control contraband in the visiting room, observed defendant put his right hand in the fly of his pants. Rich then conveyed defendant to the hospital where Dr. Alderete, director of the penitentiary hospital, made X-rays of the defendant which indicated the presence of a foreign object in the latter's rectum. Defendant denied the presence of an object, claiming that the X-ray could be explained by his history of a fractured vertebra. Later, however, defendant passed a vial containing three grams of marijuana. On the day following the incident in the visitors' room, defendant

was placed in administrative segregation, where he remained for thirty-five days.

On January 6, 1975, approximately ten months after the offense, a criminal information was filed against defendant for possession of marijuana. Trial began on February 10, 1975 and a jury verdict of guilty was returned on February 12, 1975.

I. *Prosecution's Delay in Seeking Indictment—*

Defendant contends that the government's delay of ten months from the time the offense was committed until an information was filed handicapped him in his preparation of a defense and violated his right to a speedy trial as guaranteed by the Sixth Amendment. Specifically, the defense argues that on the date of the incident in the visitors' room, defendant was temporarily insane as a result of withdrawal from morphine, a drug to which he allegedly was addicted, and that, accordingly, he was not responsible for his actions. The defense bolsters its argument by medical testimony indicating that all evidence of withdrawal is gone by the fifth day after deprivation of the drug. Therefore, according to this argument, by not indicting him quickly, the government failed to alert the defendant of the need to obtain an attorney and to gather evidence of his medical incapacity due to drug withdrawal. Because of this delay all evidence upon which a temporary insanity defense could be based was forever lost and defendant's defense was irreparably prejudiced.

In analyzing a speedy trial argument, the applicable cases can be classified into two groups: pre-accusation delay[1] and post-accusation delay. *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), has established the standard for evaluating a claim of delay at the pre-accusation level. In that case the defendant argued for dismissal of his indictment on Sixth Amendment grounds, after a three-year delay between commission of the offense and indictment occurred. Rejecting the defendant's argument, the Supreme Court held that "the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,'" *id.* at 313, 92 S.Ct. at 459, 30 L.Ed.2d at 474, and that, the primary guarantee against prosecutorial delay in seeking an indictment being the applicable statute of limitations, the government has no duty to "discover, investigate, and accuse any person within any particular period of time." *Id.* at 313, 92 S.Ct. at 459, 30 L.Ed.2d at 474. The Court held, however, that a case can be dismissed for pre-accusation delay, but only if the defense shows actual prejudice and demonstrates that the delay was an intentional device by the prosecution to gain a tactical advantage. *Id.* at 324, 92 S.Ct. at 465, 30 L.Ed.2d at 481.

*Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), is the case most often cited for the standard to be applied in post-accusation delay questions. In *Barker,* the defendant was indicted for murder in September, 1958, but was not brought to trial until October, 1963, after sixteen continuances had been obtained by the prosecution. Noting that the concept of speedy trial is vague, the Court in *Barker* refused to set down a final period of time by which the government must bring a criminal defendant to trial. Rather, it established a balancing test, triggered by a presumptively prejudicial delay, by which post-accusation delay cases must be evaluated. The four factors to be balanced include (1) length of the delay, (2) reason for the delay, (3) defendant's

---

1. The term previously used for this group of cases was pre-indictment delay. In *Dillingham v. United States,* 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975), however, the Supreme Court held that the Sixth Amendment is activated whenever the defendant becomes an accused, either through arrest or otherwise, whether or not an indictment has also been returned. Hence, we now use the term pre-accusation delay. *See also, Gravitt v. United States,* 5 Cir., 523 F.2d 1211 (1975), *reh. denied,* 5th Cir. 1976, 526 F.2d 378 [1976].

assertion of his right to a speedy trial, and (4) prejudice resulting from the delay in bringing defendant to trial. *Id.* at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

In examining defendant's Sixth Amendment claim, it is important to determine at the outset whether the actual prejudice test of *Marion* or the balancing test of *Barker* is appropriate. Obviously, the *Marion* test, requiring a showing of actual prejudice and intentional prosecutorial delay, is a harder test for claimants to meet than the more flexible balancing test of *Barker*. Not surprisingly, defendant argues that the *Barker* test is applicable in this case. The key in determining which test to apply rests on the question whether defendant was an "accused" during the ten-month delay in question.

■ Defendant argues that placement of him in administrative segregation for thirty-five days constituted an arrest, thereby rendering him an accused, subject to the *Barker* balancing test on delay. We cannot accept the argument that administrative segregation of a prisoner is equivalent to his arrest. First, we note the language in *Marion* explaining why arrest is a significant event triggering the protection of the Sixth Amendment:

. . . Arrest is a public act that may seriously interfere with the de-

fendant's liberty, whether he is free on bail or not, and that may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. . . . So viewed, it is readily understandable that *it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment. Id.* 404 U.S. at 320, 92 S.Ct. at 463, 30 L.Ed.2d at 478–79. (Emphasis added.)

Obviously, administrative segregation does not contain those incidents associated in *Marion* with arrest; that is, administrative segregation of a prisoner does not "disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy," etc.[2] In addition, *Marion* speaks of the "actual restraints imposed by arrest *and* holding to answer a criminal charge" as engaging the protection of the speedy trial provision of the Sixth Amendment. *Id.* at 320, 92 S.Ct. at 463, 30 L.Ed.2d at 479. (Emphasis added.) Here the defendant was not "charged" with a crime[3] and hence was not subject to the "anxiety and concern accompanying public accusation" that *Marion* saw as a ma-

---

**2.** Of course, we are aware that the Supreme Court has held that merely because an individual charged with a criminal offense is serving a prison term for another offense does not mean that the individual forfeits his right to a speedy trial for the pending charge. *Moore v. Arizona,* 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973). *Strunk v. United States,* 412 U.S. 434, 93 S.Ct. 2260, 37 L.Ed.2d 56 (1973). Yet, in *Strunk* and *Moore,* each of the prisoners had been charged for the offense in question while in prison and the delay that they were challenging occurred between indictment and arraignment, in *Strunk,* and between charge and trial, in *Moore*; hence, both cases were clearly governed by post-accusation standards. Here, the defendant was not charged with the crime and, thus, did not become an accused until an information was filed, after which a speedy trial was held.

**3.** Indeed, in both *Strunk, supra,* and *Moore, supra,* in which it articulated the requirement

of a speedy trial for an individual incarcerated for another offense, the Supreme Court spoke in terms of the protection afforded an "accused" or one against whom "charges are pending." For example, in *Strunk,* the Court stated, "[A] prolonged delay may subject the *accused* to an emotional stress that can be presumed to result in the ordinary person from uncertainties in the prospect of facing public trial or of receiving a sentence longer than, or consecutive to, the one he is presently serving . . . ." (emphasis added). 412 U.S. at 439, 93 S.Ct. at 2263, 37 L.Ed.2d at 61. Likewise, in *Moore,* the Court stated, "[N]o court should overlook the possible impact *pending charges* might have on his prospects for parole and meaningful rehabilitation." 414 U.S. at 27, 94 S.Ct. at 190, 38 L.Ed.2d at 186 (emphasis added).

jor reason for giving an accused a speedy trial. *Id.* at 320, 92 S.Ct. at 463, 30 L.Ed.2d at 478.

More importantly, we do not hold administrative segregation to constitute an arrest because of what we consider to be the essential nature of that act.[4] That is, administrative segregation is an internal disciplinary means of classifying prisoners, utilized under the almost total discretion of prison officials, and subject to the interference of the courts only in a case of wide abuse of that discretion. *Royal v. Clark,* 447 F.2d 501 (5th Cir. 1971), *Theriault v. Mississippi,* 433 F.2d 990 (5th Cir. 1970). Used as a method of disciplining or investigating inmates who break prison regulations, of protecting certain inmates from members of the general population, and of providing a general cooling-down period for inmates involved in events that could disrupt the general population, administrative segregation accompanying the breach of a prison regulation is in no way related to or dependent on prosecution by the federal government of an inmate for that same offense as a violation of federal criminal law. According to the testimony of Abbie Clark, a prison official at the Atlanta Penitentiary, administrative segregation would have occurred regardless of any action taken by the United States prosecutor's office. While this court has not specifically addressed the issue of the relationship between administrative segregation and arrest, the Tenth Circuit has held that administrative segregation cannot be considered an arrest. *Rivera v. Toft,* 477 F.2d 534 (10th Cir. 1973). Similarly, this court, in allowing prison officials almost total discretion over the use of administrative segregation, has recognized the independence that segregation enjoys from the traditional criminal processes that are subject to careful judicial scrutiny. In *Young v. Wainwright,* 449 F.2d 338 (5th Cir. 1971), an inmate sought an injunction to obtain his release from segre-

gation on the ground that he had violated no prison regulations; this court denied the injunction, holding that the classification of inmates is a matter of prison administration with which federal officials are reluctant to interfere. *Id.* at 339. We have likewise noted that administrative discipline utilized by prison officials for a particular offense is independent from criminal prosecution for that same offense for double jeopardy purposes. *United States v. Williamson,* 469 F.2d 88 (5th Cir. 1972); *Keaveny v. United States,* 405 F.2d 821 (5th Cir. 1969).

■■ Having determined that administrative segregation of a prisoner is an internal disciplinary measure that is totally independent from the criminal processes of arrest and prosecution, we hold that administrative segregation alone of the defendant did not render him an "accused." Because he was not an accused during the alleged delay, defendant's claim must be judged under the *Marion* standard, which requires a showing of actual prejudice and intentional delay. Under that test, we find defendant's claim that he was denied a speedy trial to be without merit. The defense nowhere alleges that the prosecutor intentionally delayed for the purpose of tactical advantage in seeking an indictment or information against the defendant. In addition, defendant certainly did not suffer the actual prejudice that *Marion* requires to be shown. He argues that delay in seeking information against him prevented him from gaining evidence that he was undergoing drug withdrawal in that the symptoms of such withdrawal disappear within five days from the time drug use stops. Yet, if we accept defendant's argument, we would be effectively imposing a five-day period from the commission of the offense by which the prosecutor must seek an indictment. Obviously, waiting five days from the time of the offense to seek an indictment does not constitute

4. *See Gravitt v. United States,* 523 F.2d 1211, 5th Cir. 1976, denying reh. to 5 Cir., 526 F.2d 378 (1975) (nature of arrest determines when right to speedy trial attaches).

an unreasonable delay by prosecution. In addition, defendant had several opportunities during the time he was allegedly suffering withdrawal pains to request aid from medical personnel, but never sought relief. This conduct, atypical of the behavior one could expect from a drug addict withdrawing from drugs, coupled with the fact that none of the prison and medical personnel observed any withdrawal symptoms from defendant during this time, compels us to believe that his claims of prejudice are speculative at best. *See, United States v. McGough,* 510 F.2d 598 (5th Cir. 1975) (speculative claims of prejudice are insufficient to meet *Marion* test of pre-indictment delay).

## II.  *Charge to Jury—*

The trial judge included in his charge to the jury one statement that defendant now alleges constitutes reversible error:

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. *So, unless the contrary appears from the evidence,* you, the jury, may draw the inference that the accused intended all the consequences that one standing in like circumstances and possessing like knowledge could reasonably have expected to result from any act knowingly done or knowingly omitted by the accused. (Emphasis added.)

While the defense attorney entered no objection at the time of the charge, he now argues that this statement constitutes plain error, under Fed.R.Crim.P., 52(b), and requires reversal.

The charge in question has been the subject of much attention in this court. We first examined it in *Mann v. United States,* 319 F.2d 404 (5th Cir. 1963), cert. denied, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964). In that case, the defendant was on trial for a willful attempt to evade income taxes when the trial judge issued the above charge to the jury. Upon appeal, this court held that the part of the charge stating "So, unless

the contrary appears from the evidence" (italicized in quote above) improperly shifted the burden of proof on the crucial issue of intent from the government to the defendant. Because the charge went to the essence of the case, we held it to be plain error justifying a reversal of the conviction, even though no objection to the charge had been entered at trial. In addition, we held that even though other statements in the charge tended to place the burden of proof on the government, these statements could not cure the effect of the objectionable burden-shifting remark.

We have since encountered the *Mann* charge, as it is popularly known, on several occasions. We carved our first exception to the *Mann* rule in *Helms v. United States,* 340 F.2d 15 (5th Cir. 1964). In that case, as in *Mann,* the trial judge gave the charge in question in a prosecution for income tax evasion. Yet, in *Helms,* we held that the giving of the *Mann* charge did not constitute reversible error since "while in both cases the government bore the burden of proving beyond a reasonable doubt the defendant's willfulness or criminal intent, in the *Mann* case the purely mental state was the crucial issue while here the contest centers about objective conduct . . . ." *Id.* at 18–19. We also held that the giving of the *Mann* charge did not always constitute plain error in that " '[p]lain error' depends upon the particular facts and circumstances of each case. In the present case it does not appear that any error in giving the instruction affected substantial rights of the defendant, and any such error does not rise to the dignity of 'plain error.' " *Id.* at 19. Thus, from *Helms* came the first dilution of what appeared to be the inflexible rule of *Mann.*

We encounter the next significant interpretation of the *Mann* rule in *United States v. Jenkins,* 442 F.2d 429 (5th Cir. 1971), in which the trial judge gave the *Mann* charge during a prosecution for a violation of the Mann Act. In that case we refused to reverse the conviction on

the basis of the objectionable charge. Yet, rather than base our holding on the *Helms* "objective conduct" exception to the *Mann* rule, we held that a curative provision[5] added by the trial judge immediately after the objectionable charge "avoided the vice in the charge in *Mann v. United States . . . .*" *Id.* at 438. *Accord, United States v. Beasley,* 519 F.2d 233 (5th Cir. 1975); *United States v. DeSimone,* 452 F.2d 554 (5th Cir. 1971), cert. denied, 406 U.S. 959, 92 S.Ct. 2067, 32 L.Ed.2d 346 (1972).

Next, in *United States v. Wilkinson,* 460 F.2d 725 (5th Cir. 1972), Judge Clark thoroughly explored the *Mann* rule and its exceptions. In *Wilkinson,* a prosecution for mail fraud, the trial judge had given a charge very similar to the forbidden *Mann* charge. While the court distinguished this *Wilkinson* charge, it noted that even a *Mann* charge would not have constituted reversible error in this context:

> Mann did not hold that the offensive sentences created incurable error. The holding there is broader:
>
> "It is not our holding that every charge using the word 'presumption' is reversible error. We do hold that it is error to give a charge in a criminal case of this nature, the overall effect of which is to place a burden upon the defendant to produce evidence to overcome a presumption of guilt." *Mann v. United States, supra,* at 410 . . . *[I]t is well-established that the fairness and accuracy of a jury charge is to be read and tested as a whole, and not by a single isolated sentence or remark. . . . [A]ny decision as to whether asserted "burden-shifting" language is so prejudicial as to necessitate reversal must to some extent turn*

upon the type of case and nature of the evidence which has been presented to the jury. . . . We decline now, as we did in *Jenkins,* to place this case squarely in either a *Mann*-subjective or *Helms*-objective category. However, we do note that here the jurors were not reduced solely to presuming intent as they were in *Mann* and *Driscoll . . . .* Here, if they chose to accept it, they were presented with undisputed evidence that Wilkinson made admissions indicating he knew certain invoices were fraudulent . . . . To paraphrase *Mann,* in *a criminal case of this nature, the overall effect of the charge did not place a burden upon the defendant* to produce evidence to overcome a presumption of guilt. *United States v. Wilkinson,* at 732–33. (Emphasis added.)

Finally, in *United States v. Durham,* 512 F.2d 1281 (5th Cir. 1975), we held that language in the charge stating that the defendant was entitled to a presumption of innocence, that the government had the burden of proving the guilt of the defendant beyond a reasonable doubt, and that the burden never shifted to the defendant, was somewhat curative of the court's error in giving the *Mann* charge, even though remotely placed in relation to that charge.[6] *Id.* at 1288.

After a thorough examination of the facts and charge given in this case, we hold that in light of *Jenkins, Wilkinson,* and *Durham,* the use of the *Mann* charge does not here constitute reversible error. Aware that a "jury charge is to be read and tested as a whole, and not by a single isolated sentence," *Wilkinson, supra* at 732, we note that the trial judge included within his charge several statements that properly placed the bur-

---

**5.** The curative provision given by the trial judge in *Jenkins, supra,* reads as follows:

Unless otherwise instructed, in determining the issue as to intent, the jury is entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence in the case which may aid in determination of state of mind.

But the jury will always bear in mind that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. *United States v. Jenkins,* 442 F.2d at 438.

**6.** Another factor in our decision not to reverse was the applicability of Helms to the facts in *Durham.*

den of proof on the government. These curative statements include the charge that the law presumes a defendant to be innocent of crime, that the presumption of innocence alone is sufficient to acquit the defendant unless the jury is convinced beyond a reasonable doubt of the defendant's guilt, that the burden is always upon the government to prove guilt beyond a reasonable doubt, *and that the burden never shifts to a defendant, either to call any witnesses or to produce any evidence.* (Emphasis added.) These same statements were included in the charges in *Jenkins, Wilkinson,* and *Durham* and, in each of these cases, were mentioned as factors in the court's decision not to reverse the conviction on the basis of the *Mann* charge.

Important to our decision today is an examination of "the type of case and nature of the evidence which has been presented to the jury." *United States v. Wilkinson, supra* at 733. The defendant here was prosecuted for a violation of 21 U.S.C. § 844 which provides in pertinent part that it shall be unlawful for any person knowingly or intentionally to possess a controlled substance unless the controlled substance was obtained under circumstances not here present. At trial, the defendant took the stand and conceded that he consciously picked up the vial and observed that it contained marijuana.[7] In our view, the defendant at that point conceded the elements of the crime. His attorney had already withdrawn an insanity defense; after establishing that the substance in the vial was a "controlled substance," the only element left to be proved was whether the defendant "knowingly or intentionally" possessed the substance. The term "knowingly" has been defined as "pur-

poseful, intentional, as distinguished from accidental or inadvertent." *Fromberg v. Thornhill,* 315 F.2d 407 (5th Cir. 1963). We interpret this to mean that the act in question was volitional. Certainly, defendant's testimony that he saw the vial, decided to see what was in it, observed the substance and realized that it was marijuana establishes volition. The judge also instructed the jury that the government had to prove that the defendant "willfully" possessed the marijuana. He defined "willfully" to mean that the defendant knew that his act was prohibited by law. While the prosecution did use the word "willfully" in its information, the term, as used by the trial judge, was not an element of the crime as defined by statute. At any rate, even assuming that the prosecution had to prove that the defendant knew that his possession of marijuana was a violation of the law and that the *Mann* charge improperly shifted the burden of proof on that issue to the defendant, defendant's testimony that he had a prior conviction for possession of marijuana should render that error harmless.

While we do not find it necessary to reverse this particular case, we emphasize that the *Mann* charge has been declared to constitute error many times since the *Mann* decision was handed down in 1963. Why trial judges continue to maintain this charge in their repertoire is a mystery to us. We cannot too strongly admonish them to discontinue its use immediately. The charge suggested in *Wilkinson, supra* at 733, should be an acceptable substitute.

III.  *Elicitation of Verdict from Jury—*

■ Defendant also assigns as error the action of the trial judge in encourag-

---

7. Defendant testified as follows:

BY MR. HENRY:
Q  Describe your state of mine at that time when you—at the exact moment you saw that vial.
A  Well, when I saw—when I saw it, I knew, I mean, it was something, I didn't know exactly what it was, and I picked it up, and I looked at it.
Q  Have you seen that sort of vial before?
A  Well, I guess probably I have. Looked like a plastic or glass type vial to me. I don't really know what it was.
Q  And in your mind did you think it contained narcotics?
A  Yes, sir. It looked like—when I looked at it, it looked like it was marijuana. I didn't know for sure what it was, but that's what it looked like.
MR. HENRY: Nothing further.

ing unanimity after a negative response by a juror during the poll of the jury. The following colloquy occurred during the poll of the jury:

THE CLERK: Thank you. You may be seated. Mrs. Laverne P. Grey. Was the verdict as published your verdict?

MRS. GREY: No. But then—

THE CLERK: Is it now your verdict?

MRS. GREY: Yes.

THE COURT: Wait a minute. Did you agree to the verdict?

MRS. GREY: But he said was it first my—my first—

THE COURT: Okay. Ask her the question again.

THE CLERK: Was the verdict as published, as I read it, your verdict?

MRS. GREY: Yes.

THE CLERK: Is it now your verdict?

MRS. GREY: Yes.

Counsel for the defendant objected to acceptance of the verdict under these circumstances, after which the court again addressed the juror in question:

THE COURT: I understand the answer of the juror to indicate that at some stages in the proceedings she had a different opinion and may have voted differently.

Now I will ask you. Was the verdict at the time of the final vote, final deliberation, the final verdict; was it your verdict and did you concur in it?

MRS. GREY: Yes.

THE COURT: Do you now concur in it?

MRS. GREY: Yes.

THE COURT: All right.

Defendant cites *United States v. Sexton,* 456 F.2d 961 (5th Cir. 1972) and *United States v. Edwards,* 469 F.2d 1362 (5th Cir. 1972), in support of his contention that, following this colloquy, the jury should have been required to retire and give further consideration. We find the cited cases clearly distinguishable from the present case. In *Sexton,* the court had virtually forced a juror to make a decision in open court by asking a juror, who stated that he had not voted either way, whether the verdict of the jury was his verdict. In *Edwards,* the juror stated that the jury's verdict was her verdict, but that she was still in doubt. Rather than inquire into the juror's statement of doubt, the trial court merely asked again if the verdict was hers. In this case, it seems clear that the juror had simply misunderstood the first question and had no doubts about the verdict she gave. There is a distinction between the conduct of a trial judge who attempts to obtain clarity and that of a trial judge who attempts to coerce a final verdict, even if that verdict is not the product of free choice by each of the jurors. We also note that following its second questioning of the juror, the court asked if there was anything further to be taken up in this matter and defense counsel answered "no," declining to request that the jury retire for further deliberation.

Affirmed.